993 A.2d 258

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. B.M. AND T.B., DEFENDANTS–APPELLANTS.

IN THE MATTER OF THE GUARDIANSHIP OF Z.T.T.B., A MINOR–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 16, 2010—Decided April 29, 2010.

Before Judges SKILLMAN, GILROY and SIMONELLI.

*Carol Willner,* Designated Counsel, argued the cause for appellant, B.M. (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Willner,* on the brief).

*Anthony J. Van Zwaren,* Designated Counsel, argued the cause for appellant, T.B. (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Van Zwaren,* on the brief).

*Emily Weisslitz,* Deputy Attorney General, argued the cause for respondent, New Jersey Division of Youth and Family Services (*Paula T. Dow,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Weisslitz,* on the brief).

*Christopher A. Huling,* Assistant Deputy Public Defender, argued the cause for minor-respondent, Z.T.T.B. (*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney; *Mr. Huling,* of counsel and on the brief).

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

The most significant issue presented by this consolidated appeal from a judgment terminating parental rights is whether the part of a medical report containing a doctor's expert opinion was properly admitted into evidence under *Rule* 5:12–4(d). We conclude for the reasons set forth in section III of this opinion that such a report constitutes inadmissible hearsay unless the Division of Youth and Family Services (DYFS) establishes all the prerequisites of *N.J.R.E.* 803(c)(6) for its admission as a business record and that DYFS failed to establish those prerequisites regarding the medical report introduced into evidence in this case. We also conclude for the reasons set forth in section II of this opinion that DYFS's failure to provide that report to appellants or to give them any other notice before trial that DYFS was alleging that their child was born with fetal alcohol syndrome constituted a denial of

due process, which requires a reversal of the judgment terminating parental rights.

## I.

The case involves parental rights to a baby boy, Z.B., who was born on March 9, 2006. The appellants are T.B., who is Z.B.'s mother, and B.M., who is Z.B.'s father.

The hospital discharge summary reported that a "urine toxicology" test performed on Z.B. was "positive for cocaine." However, the discharge summary also reported that Z.B.'s "physical findings were normal for term newborn baby and vital signs were stable." There is no indication Z.B. exhibited any withdrawal symptoms at birth as a result of the presence of cocaine in his system.

T.B. had nine other children before giving birth to Z.B., and DYFS has had substantial involvement with her over a period of close to twenty years, which has resulted in a series of allegations of neglect of her children. T.B.'s dependency upon cocaine has been a major contributing cause of that neglect. None of T.B.'s other children are in her custody. T.B.'s relatives have raised those other children and for this reason DYFS has not previously brought an action against her for the termination of parental rights.

Before the proceedings relating to Z.B., DYFS had had only limited involvement with B.M. However, B.M. fathered four of T.B.'s other children, two of whom were born addicted to cocaine, and never actively undertook to serve the role of caretaker for any of those children. B.M. also apparently resided with T.B. during the course of her pregnancy with Z.B.

Based on Z.B.'s positive test for the presence of cocaine, T.B.'s history of drug abuse, and T.B.'s inability to care for her other children, DYFS took custody of Z.B. before his discharge from the hospital and filed an action seeking care, custody, and supervision. The trial court granted DYFS's application for custody of Z.B., who was placed in foster care with the ex-wife of T.B.'s cousin.

Z.B. has remained in the custody of this foster parent, who wishes to adopt him, for more than three years.

In October 2007, DYFS filed a complaint for the termination of T.B.'s and B.M.'s parental rights to Z.B. The case was tried over three days in May 2009, which resulted in the judgment terminating parental rights that is the subject of this appeal.

Because we conclude the trial court committed reversible error in admitting a medical report which concluded Z.B. exhibits symptoms "consistent with Fetal Alcohol Spectrum Disorder" and relying upon this report to find that DYFS had established grounds for the termination of parental rights, it is only necessary to summarize the portions of the trial record relating to the admission into evidence of this report.

This report, by Dr. Uday Mehta of Children's Specialized Hospital, first surfaced on the first day of trial. During the direct examination of a DYFS case worker, the following colloquy occurred:

Q. And how do you know about [Z.B.'s] behavioral issues; is it just through [Z.B.'s foster mother] or have you had an opportunity to speak with [Z.B.'s] doctor?

A. Yes. I—I have a note that I just received that said that he—he is diagnosed with fetal alcohol syndrome, something of that nature.

Q. And you just received that from whom?

A. Dr. Mehta.

. . . .

THE COURT: Where is Dr. Mehta from?

THE WITNESS: She runs Specialized Hospital.

THE COURT: When did you get that?

THE WITNESS: I got it today.

[Counsel for B.M.]: Judge, we haven't seen it.

THE COURT: I bet you haven't.

[Counsel for T.B.]: That's correct.

THE COURT: I bet you, [counsel for B.M.], the deputy hasn't seen it, but—

[Counsel for DYFS]: I just received—

THE COURT:—I'm not a betting man. So just—

[Counsel for B.M.]: She's about to reference that she just got it, I think, Judge.

There was no further discussion of the report during the first day of trial.

The trial court again raised the issue of Dr. Mehta's diagnosis of fetal alcohol syndrome in its questioning of B.M.'s psychological expert during the second day of trial, stating to the expert:

I don't want to so to speak spring it on you because we just got it yesterday. . . .

[W]e have I believe a validation of not just a cocaine birth but fetal alcohol syndrome is operating on this child from what we read of Dr. Mehta's report.

The expert responded:

The information you're giving now about the fetal alcohol syndrome kind of brings a greater depth to some of what I have observed and fits in certainly concurrently with what I'm finding and reinforces that issue. . . .

The Law Guardian returned to the subject of fetal alcohol syndrome during her cross-examination of B.M.'s psychological expert:

Q. Well, if I were to tell you that the diagnosis was made by the fetal—and the medication prescribed by the fetal alcoholic syndrome diagnostic center of Children's Specialized Hospital, would that in any way change your answer?

A. No. In fact, it raises more questions. If—if they're saying the child by nature, if you're—because it was made by fetal alcohol syndrome unit and with the information I just received an hour or so ago from the Judge, wasn't this information disseminated to the other experts and all the other people involved in the case? Where was the diagnosis of fetal alcohol syndrome in the record? I didn't see it.

So it brings up more questions because that certainly would be a primary diagnostic issue, if that was a valid diagnosis that you would have to have any future involvement of any care giver, any service provider, any evaluator of this child to have such information.

Dr. Mehta's report was admitted into evidence at the close of DYFS's case after the following rather obscure colloquy between the court and the counsel for B.M. and DYFS:

[Counsel for B.M.]: Judge, can we clarify the last exhibit that counsel. . . .

The Court: 104, the Children's Specialized Hospital?

[Counsel for B.M.]: Yes.

The Court: Yes.

[Counsel for B.M.]: Thank you.

The Court: That's good. I know that's the—by the way, that thing is stale, but what we've got we didn't get anything further except for the reference and I don't have it in front of me, and obviously, all of us were very concerned about that aspect. So wherever this case goes—

[Counsel for DYFS]: Certainly. I will make sure that—

The Court:—get an order if you want to forward the necessary language. Because I think that's a high priority.

The trial court referred extensively to Dr. Mehta's report in finding that the evidence presented by DYFS established the required grounds for the termination of parental rights. The court recognized that this report had been produced for the first time during trial:

I am going to set out as a prologue that [Z.B.] is being seen apparently at Children's Specialized Hospital in their fetal alcohol system—syndrome diagnostic center located in Mountainside. The latest report which apparently from what I can read is dated up to December of '08, unfortunately, was not received by us until the second and final courtroom testimonial day by the Division and counsel as well as the Court could not provide same obviously to [the parties' psychological experts] for their evaluation before their testimony.

Nevertheless, the court relied upon Dr. Mehta's report in finding that Z.B. had been born with fetal alcohol syndrome. In finding that DYFS had established the first requirement for the termination of parental rights—that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[,]" *N.J.S.A.* 30:4C–15.1(a)(1)—the court "point[ed] to [Z.B.'s] cocaine-assaulted system at birth and later discovered alcohol-damaged psyche, by [T.B.'s] own direct actions and conduct before the birth." Dr. Mehta's report was the only evidence presented at trial that Z.B. suffers from fetal alcohol syndrome or any other adverse physical condition as a result of T.B.'s consumption of alcohol during her pregnancy with him. The court also observed that Z.B.'s foster mother had received a report that Z.B. had "unfortunately had been diagnosed with fetal alcohol syndrome at this point in his early life; thus, the importance of the Specialized Hospital report to be obtained in his best interest."

## II.

"At a minimum, due process requires that a party in a judicial hearing receive 'notice defining the issues and an adequate opportunity to prepare and respond.'" *H.E.S. v. J.C.S.*, 175 *N.J.* 309, 321–22, 815 *A.2d* 405 (2003) (quoting *McKeown–Brand v.*

*Trump Castle Hotel & Casino,* 132 *N.J.* 546, 626 *A.*2d 425 (1993)). "There can be no adequate preparation [for trial] where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice." *Id.* at 322, 815 *A.*2d 405 (quoting *Nicoletta v. N. Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145, 162, 390 *A.*2d 90 (1978)).

Neither the Title 9 abuse or neglect complaint DYFS filed against appellants nor the Title 30 complaint seeking termination of their parental rights alleged that T.B. had "endangered" Z.B.'s "safety, health or development" within the intent of *N.J.S.A.* 30:4C–15.1(a)(1) by consuming sufficient alcohol during her pregnancy with Z.B. to cause him to suffer from fetal alcohol syndrome. Moreover, DYFS did not give appellants any other form of notice before trial that Z.B. suffers from fetal alcohol syndrome. Indeed, the Deputy Attorney General representing DYFS does not appear to have been aware before trial of Dr. Mehta's report, which concluded that Z.B. has symptoms "consistent with Fetal Alcohol Spectrum Disorder." Rather, the allegation that T.B. had abused alcohol during her pregnancy with Z.B., thereby causing him to be born with fetal alcohol syndrome, was interjected into the case for the first time on the first day of trial when the court referred to the report in questioning DYFS's case worker and psychological expert. Therefore, appellants did not receive any notice of this charge before trial or even at the outset of the trial, thus depriving them of the opportunity of calling their own witness on the subject of fetal alcohol syndrome or examining whatever medical records Dr. Mehta may have reviewed in reaching this conclusion. We conclude that this denial of notice of the allegation that Z.B. suffers from fetal alcohol syndrome constituted a deprivation of due process. *See N.J. Div. of Youth & Family Servs. v. A.R.G.,* 179 *N.J.* 264, 285–86, 845 *A.*2d 106 (2004).

DYFS's failure to notify appellants before trial that it would be relying upon a medical opinion that Z.B. suffers from fetal alcohol syndrome cannot be found to be harmless error. Although the

trial court found that Z.B. not only suffers from fetal alcohol syndrome but also that his system was "drug damaged" at birth by T.B.'s ingestion of cocaine during her pregnancy, the record does not support the latter finding. The hospital discharge summary reported that Z.B. tested "positive for cocaine" in a urine toxicology analysis. However, the summary did not indicate that Z.B. was born addicted to or otherwise damaged by the cocaine detected in his system. To the contrary, the summary stated that Z.B.'s "physical findings were normal for newborn baby and vital signs were stable."

■ "Drug use during pregnancy, in and of itself, does not constitute a harm to the child under *N.J.S.A.* 30:4C–15.1(a)(1)." *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 349, 736 *A.2d* 1246 (1999). Such harm may be found only "when that drug use results in the child being born addicted to drugs with the attendant suffering caused by such addiction." *Id.* at 350, 736 *A.2d* 1246. Because there is no evidence Z.B. was born addicted to drugs, the detection of cocaine in Z.B.'s system would not be sufficient, by itself, to support a finding that Z.B.'s "health or development [had] been or will continue to be endangered by the parental relationship[.]" *N.J.S.A.* 30:4C–15.1(a)(1). Consequently, the trial court's erroneous admission of Dr. Mehta's report and reliance upon that report to find that Z.B. suffers from fetal alcohol syndrome did not constitute harmless error.

■ Moreover, appellants' failure to object to the admission into evidence of Dr. Mehta's report would not warrant the conclusion that the introduction of this report constituted "invited error." Appellants' counsel were not expressly asked, as in *New Jersey Division of Youth & Family Services v. M.C., III*, 201 *N.J.* 328, 339–40, 990 *A.2d* 1097 (2010), whether they had any objection to the admission of Dr. Mehta's report. Furthermore, the trial court's repeated use of that report in questioning witnesses before it was offered in evidence implied that the court already considered the report part of the evidence in the case, thus suggesting that any objection to its formal admission would have been futile.

Most significantly, unlike in *M.C., III,* Dr. Mehta's report was not simply one additional piece of evidence in support of DYFS's case against appellants, but rather a document that introduced a new charge of abuse of Z.B., without notice before trial, thereby depriving appellants of due process of law. Therefore, the denial of the right to argue that the admission of this report constituted a deprivation of due process based on the doctrine of "invited error" would "cause a fundamental miscarriage of justice." *Id.* at 342, 990 *A.*2d 1097 (quoting *Brett v. Great Am. Recreation, Inc.,* 144 *N.J.* 479, 503, 677 *A.*2d 705 (1996)).

## III.

Although our conclusion that the admission of Dr. Mehta's report resulted in a deprivation of due process requires a reversal of the judgment terminating appellants' parental rights and a remand to the trial court for further proceeding, we also conclude that Dr. Mehta's report would not be admissible even if DYFS gave sufficient advance notice of its intent to offer the document, unless appellants consented to its admission or DYFS were able to establish the prerequisites for its admission as a business record under *N.J.R.E.* 803(c)(6).

*Rule* 5:12–4(d), upon which DYFS relies in arguing that Dr. Mehta's report was properly admitted into evidence, states:

The Division of Youth and Family Services shall be permitted to submit into evidence, *pursuant to N.J.R.E. 803(c)(6) and 801(d),* reports by staff personnel or professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal.

[Emphasis added.]

By its plain terms, this rule only authorizes the admission into evidence of a DYFS professional consultant's report "pursuant to" *N.J.R.E.* 803(c)(6) and 801(d), which set forth the so-called "business records" exception to the rule against hearsay.

*N.J.R.E.* 803(c)(6) provides:

A statement contained in writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person,

if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

*N.J.R.E.* 801(d) provides:

A "business" includes every kind of business, institution, association, profession, occupation and calling, whether or not conducted for profit, and also includes activities of governmental agencies.

Under these evidence rules, a party seeking to introduce a hearsay statement under the business record exception "must demonstrate that [1] 'the writing [was] made in the regular course of business,' [2] the writing was 'prepared within a short time of the act, condition or event being described,' and [3] 'the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence.' " *M.C., III, supra*, 201 *N.J.* at 347, 990 *A.*2d 1097 (quoting *State v. Matulewicz*, 101 *N.J.* 27, 29, 499 *A.*2d 1363 (1985)). In determining whether the third of these tests for admission of a hearsay statement under the business records exception has been satisfied, "the degree of complexity of the procedures utilized in formulating the conclusions expressed in the ... report [is] critical." *Matulewicz, supra*, 101 *N.J.* at 30, 499 *A.*2d 1363; *see also N.J.R.E.* 808. An expert medical opinion contained in a report is generally inadmissible under this test because of the complexity of the analysis involved in arriving at the opinion and the consequent need for the other party to have an opportunity to cross-examine the expert. *See, e.g., Brun v. Cardoso*, 390 *N.J.Super.* 409, 421–22, 915 *A.*2d 1053 (App.Div.2006); *In re Commitment of G.G.N.*, 372 *N.J.Super.* 42, 56–57, 855 *A.*2d 569 (App.Div.2004); *Nowacki v. Cmty. Med. Ctr.*, 279 *N.J.Super.* 276, 284, 652 *A.*2d 758 (App. Div.), *certif. denied*, 141 *N.J.* 95, 660 *A.*2d 1194 (1995); *see also Agha v. Feiner*, 198 *N.J.* 50, 65 n. 9, 965 *A.*2d 141 (2009).

DYFS did not lay a foundation for admission of Dr. Mehta's report under *N.J.R.E.* 803(c)(6) at trial and DYFS does not argue on appeal that the report could qualify for admission under this evidence rule. Instead, DYFS argues that an expert

opinion contained in a report of a DYFS-retained professional consultant may be admitted under *Rule* 5:12–4(d) without satisfying the prerequisites for admissibility set forth in *N.J.R.E.* 803(c)(6).

Although the Court in *M.C., III* discussed *N.J.R.E.* 803(c)(6) in the course of its consideration of *Rule* 5:12–4(d), 201 *N.J.* at 346–47, 990 *A.*2d 1097, it did not directly address the question whether a document offered into evidence under *Rule* 5:12–4(d) must satisfy the conditions of admissibility set forth in *N.J.R.E.* 803(c)(6). Therefore, this still seems to be an open question. However, in our view, the plain language of *Rule* 5:12–4(d), the prerequisites for the adoption of evidence rules under the Evidence Act of 1960, *N.J.S.A.* 2A:84A–33 to –44, and the constitutional constraints imposed upon a state that brings an action seeking termination of parental rights, all lead to the conclusion that a report offered into evidence under *Rule* 5:12–4(d) may be admitted only if it satisfies the prerequisites for admissibility set forth in *N.J.R.E.* 803(c)(6). *See N.J. Div. of Youth & Family Servs. v. E.D.,* 233 *N.J.Super.* 401, 413–14, 558 *A.*2d 1377 (App. Div.), *certif. denied,* 118 *N.J.* 232, 570 *A.*2d 983 (1989); *W.W. v. I.M.,* 231 *N.J.Super.* 495, 522–26, 555 *A.*2d 1149 (App.Div.1989) (Skillman, J., dissenting).

*Rule* 5:12–4(d) states that "[DYFS] shall be permitted to submit into evidence, *pursuant to N.J.R.E. 803(c)(6) and 801(d),* reports by staff personnel or professional consultants." (Emphasis added). The term "pursuant to" is generally understood to mean "in compliance with" or "in accordance with." *See Black's Law Dictionary* 1250 (7th ed.1999). If the Supreme Court had intended in adopting *Rule* 5:12–4(d) to authorize the introduction into evidence of the reports of DYFS professional consultants even though DYFS could not satisfy the prerequisites for admissibility set forth in *N.J.R.E.* 803(c)(6), it undoubtedly would have used language suitable to that purpose, such as "notwithstanding *N.J.R.E.* 803(c)(6) and 801(d)" or "without complying with *N.J.R.E.* 803(c)(6) and 801(d)." The Court's use instead of the

phrase "pursuant to *N.J.R.E.* 803(c)(6) and 801(d)" indicates that it did not intend in adopting *Rule* 5:12–4(d) to create an exception to the prerequisites for admission of a business record set forth in *N.J.R.E.* 803(c)(6).

This conclusion is reinforced by the fact that *Rule* 5:12–4(d) is part of the rules of court, which the Court adopted without participation by the Legislature in accordance with the Evidence Act of 1960, *N.J.S.A.* 2A:84A–33 to –44, under which evidence rules must be adopted jointly by the Court and the Legislature. See *State v. Byrd*, 198 *N.J.* 319, 342–50, 967 *A*.2d 285 (2009); *State v. D.R.*, 109 *N.J.* 348, 371–77, 537 *A*.2d 667 (1988); *Busik v. Levine*, 63 *N.J.* 351, 367–68, 307 *A*.2d 571 (1973), *appeal dismissed*, 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973). Furthermore, the standards and procedures governing an action for termination of parental rights are prescribed by statute. *See N.J.S.A.* 30:4C–11 to –15.4. Therefore, we are particularly reluctant to construe a court rule such as *Rule* 5:12–4(d), which was adopted without participation by the Legislature in accordance with the Evidence Act of 1960, as having been intended to adopt an additional exception to the rule against hearsay in such a statutory proceeding.

 Our final reason for concluding that *Rule* 5:12–4(d) should not be construed to authorize the admission into evidence of the part of a medical report that does not satisfy the prerequisites for admissibility set forth in *N.J.R.E.* 803(c)(6) is that parents have a "fundamental liberty interest . . . in the care, custody and management of their child," which is protected by the Due Process Clause of the Fourteenth Amendment. *Santosky v. Kramer*, 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394–95, 71 *L.Ed.*2d 599, 606 (1982). The Supreme Court has held that this liberty interest requires a State to prove the grounds for termination of parental rights by "clear and convincing evidence." *Id.* at 758–70, 102 *S.Ct.* at 1397–1403, 71 *L.Ed.*2d at 609–17. In reaching this conclusion, the Court observed that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a

commanding one[,]" and that " '[i]ncreasing the burden of proof is one way ... to reduce the chances that inappropriate' terminations will be ordered." *Id.* at 759, 764–65, 102 *S.Ct.* at 1397, 1400–01, 71 *L.Ed.*2d at 610, 614.

It is arguable that just as the more demanding burden of proof by "clear and convincing" evidence is required to reduce the risk of an erroneous termination of parental rights, there also should be more demanding rules of admissibility of evidence in termination proceedings. However, without reaching that issue, we conclude that interpreting *Rule* 5:12–4(d) to authorize a more relaxed standard for the admissibility of hearsay evidence in an action for termination of parental rights than applies in other civil litigation would be inconsistent with the procedural protections the Supreme Court has held must be extended to the fact-finding process in an action for termination of parental rights.

We add that this conclusion is supported by decisions in other jurisdictions. *See, e.g., Ark. Dep't of Human Servs. v. Huff,* 347 *Ark.* 553, 65 *S.W.*3d 880, 886 (2002) (holding that a caseworker's report of a "home study" was properly excluded from evidence based on the fundamental liberty interest of parents in termination of their parental rights recognized in *Santosky* ); *Lewis v. Dep't of Health & Rehabilitative Servs.,* 670 *So.*2d 1191, 1193–94 (Fla.Dist.Ct.App.1996) (holding that due process proscribed admission of social investigation reports without notice or opportunity for cross-examination, based on parents' "fundamental liberty interest" recognized in *Santosky* ); *In re Termination of the Parent–Child Relationship of E.T. & B.T.,* 808 *N.E.*2d 639, 644 (Ind.2004) (rejecting a "decision ... to terminate one of the most valued relationships in our culture ... rest[ing] on the opinion of a person who has never been placed under oath and whose expertise and opinion have never been subjected to the crucible of cross-examination") (internal citations omitted); *In re K.C.P.,* 142 *S.W.*3d 574, 580 (Tex.App.2004) (holding that due process requires application of more stringent rules regarding admissibility of

134

laboratory reports in termination cases than in other civil litigation).

## IV.

Accordingly, we reverse the judgment terminating appellants' parental rights and remand to the trial court for rehearing and reconsideration. Because the sole ground for reversal is the erroneous admission of Dr. Mehta's report, the parties may rely on the record of the original trial on the remand, except for Dr. Mehta's report and any testimony based on that report. Although we assume that the primary focus of any new evidence presented on remand will be directed at whether Z.B. suffers from fetal alcohol syndrome, we do not preclude the parties from offering other relevant evidence. Because of the importance of prompt disposition of cases involving the termination of parental rights, we retain jurisdiction. The proceedings on remand shall be completed by July 30, 2010.