# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3698-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

N.J.,

     Defendant-Appellant/
     Cross-Respondent,

and

J.B.,

     Defendant.

_____

IN THE MATTER OF S.B., A.B.,
and C.B., Minors,

     Respondents/Cross-Appellants.

_____

     Submitted September 10, 2019 – Decided September 25, 2019

     Before Judges Hoffman and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0159-17.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent (Phuong Ving Dao, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for respondents/cross-appellants (Nancy P. Fratz, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Michael A. Thompson, Deputy Attorney General, on the brief).

PER CURIAM

Defendant N.J.[1] appeals from the June 16, 2017 Family Part order finding that she was grossly negligent when she drove while intoxicated, with her then twelve-year-old daughter A.B. (Amanda) and her then four-year-old son C.B. (Carl) in the car. In addition, the Law Guardian for the children cross-appeals from the same order, alleging the Division of Child Protection and Permanency (the Division) misled the trial court to believe defendant failed to provide requested medical records. In addition, the Law Guardian asserts defendant's

---

[1] We use initials to protect the privacy of the parties and their children. For ease of reference, we refer to N.J. as defendant and to J.B. as defendant's husband; in addition, we use pseudonyms to refer to the parties' children.

attorney provided ineffective assistance by failing to present the medical records at trial. We affirm.

I

We discern the following facts from the record. On October 5, 2016 at 4:33 p.m., the Division received a referral from the Bridgewater Police Department (BPD) reporting that defendant had been pulled over on October 4, 2016, with her two minor children in her car, and charged with driving while intoxicated (DWI).

Upon receiving the referral, the Division immediately investigated and attempted to interview defendant, initially making at least two attempts at contacting defendant that same day, without success. The Division's screening summary indicates that when caseworkers arrived at defendant's home at 9:20 p.m., "[a]n adult male answered the door and indicated that [defendant] was not home and would not be home until tomorrow. He would not identify himself or advise workers of the whereabouts of [defendant] or her children." The caseworkers returned to the home eighty-five minutes later, at 10:45 p.m., in a further attempt to contact defendant; at that time, "there was no answer." Seventy-five minutes later, at midnight, defendant arrived at a hospital

3

emergency room (ER) by ambulance "after family witnessed a tonic clonic seizure."[2]

On June 7, 2017, the trial court conducted a factfinding hearing. The Division presented two witnesses: a Division caseworker and Officer Joseph Daley. The Division moved three exhibits into evidence: the Division's screening summary, its investigation report, and a BPD incident report. Defendant testified in her own defense and also presented her adult son and husband as additional witnesses. Defendant offered no other evidence.

Officer Daley, a BPD patrol officer with more than fourteen years' experience, described the traffic stop that resulted in the DWI charge against defendant. On the evening of October 4, 2016,[3] Officer Daley observed a vehicle swerving within the eastbound lane on U.S. Highway 22, which he described as "drifting . . . touching one line to the other line." He stopped the vehicle and requested the driver's license, registration, and insurance card, which defendant provided. At that point, he detected "an odor of an alcoholic

---

[2] Defendant's hospital record further indicates that defendant's husband reported that after his wife had gone to bed, he "came to see her, [and] she was stiffened, shaking all extremities, and foaming at the mouth . . . . [Patient] cannot remember the episode."

[3] The BPD incident report indicates the stop occurred at 11:53 p.m.

A-3698-17T4

beverage coming from [defendant's] breath," and asked her "if everything was okay." She replied that "she was fine," explaining "she got turned around . . . looking to get on [Route] 287."

While speaking with defendant, Officer Daley continued to smell the odor of alcohol. Before asking defendant to exit her vehicle, he asked her to recite the alphabet from "C" to "M," and she was unable to do so. He then repeated the instructions and defendant still could not successfully complete the test; at that point, he asked her to step out of the vehicle.

Officer Daley then attempted to administer two field sobriety tests: the horizontal gaze nystagmus (HGN) test and the walk and turn test. He explained that the HGN test looks for "involuntary jerking movements of the eye, which is an indicator of possible intoxication." He stated he held his pen "out in front of [defendant] 10 to 15 inches away," and instructed "her to keep her head still" as he moved a "pen back and forth and then just follow the movement of the pen with her eyes"; however, he could not adminster the test because defendant repeatedly failed "to follow the instructions for the test." Defendant also failed to complete the walk and turn test successfully. Initially, Officer Daley stopped the test when defendant started walking out towards the highway. After guiding

defendant back to the front of the vehicle, he again attempted to administer the test but defendant became belligerent and was subsequently arrested for DWI.

Officer Daley continued to smell alcohol emanating from defendant while transporting her to the police station, where defendant refused to submit to an Alcotest. Officer Daley then charged defendant with DWI, refusal to submit to a breath test, failure to maintain lane, and driving while suspended.

Officer Daley testified that defendant did not tell him, at any time, that she had been injured earlier that day, or at any time prior, nor did she advise him that she had been assaulted and might be suffering from a concussion. He also did not observe any bruising, swelling, or injuries to defendant's face or head, either at the scene or at the police station.

The caseworker testified next, recounting the Division's investigation and findings regarding the October 5, 2016 referral. She detailed the Division's multiple attempts to meet with defendant and her family at their home the same day as the referral. The caseworker finally made contact with the family on October 7, 2016. She first interviewed Amanda, who stated her mother was pulled over for swerving, and that the police officer made her mother recite the alphabet and leave the car. Amanda did not believe her mother's car was

A-3698-17T4

swerving; however, she did state her mother was unable to complete the alphabet. She did not observe anything after her mother got out of the car.

The caseworker next spoke with defendant, reaching her on her cell phone. Defendant advised that "she was currently hospitalized" because of "a seizure," and said "they were still running tests to see what was wrong with her." The caseworker said defendant did not state that she had suffered a concussion or had been assaulted, or that her seizure was the result of an injury. Defendant told her the DWI charge was "unfounded . . . . she was not intoxicated and . . . she would be fighting the charges."

When the caseworker finally met defendant on October 17, 2016, she continued to deny the allegations of intoxication and, for the first time, told the caseworker that a concussion caused her to fail the field sobriety tests. The caseworker asked defendant if she told the arresting officer she had been assaulted or that she had a concussion, and defendant said she had not. Defendant told the caseworker she received the concussion when a Somerset fireman assaulted her and that she did not report the incident nor did she go to the hospital to treat her injuries. The caseworker asked defendant for her hospital discharge paperwork but she could not locate it. Defendant said she would fax it as soon as she found it.

7

The caseworker testified the Division determined that the allegations of abuse and neglect against defendant were "[e]stablished" due to the observations made by the BPD, leading to her arrest and DWI charge, with her children in the vehicle. On cross-examination, the caseworker acknowledged the Division eventually received defendant's medical records several months later and the hospital records indicated that defendant reported she had been assaulted.

Defendant testified that she was with Amanda and Carl all day on October 4, 2016. She indicated that she took her children to a doctor's appointment and then spent the majority of the day at her uncle's home in Plainfield. Defendant said she was assaulted by her uncle prior to leaving his home, which she left between 11 p.m. and midnight. She claimed she did not know the extent of her injuries and was simply trying to get home when she was stopped by the police. Defendant admitted she was unable to complete any of the field sobriety tests, but claimed that she advised the officer that she had numerous medical issues and disabilities that would prevent her from standing "surefooted." Defendant also claimed she advised the officer that she was hurt, that she had visible bruises on her face, and that she "had no shoes on."

On cross-examination, defendant testified that she was punched in the head "maybe twenty" times by her uncle, that she was rendered unconscious for

a few seconds, but that she did not think her injuries were severe enough to warrant going to the hospital that night. Defendant could not recall how soon after the alleged incident she contacted her adult son J.B. (Jason) to come pick her up; in addition, she initially could not state how and when she knew she had visible injuries to her face. Defendant later testified that she saw the injuries a few days later in the hospital.

Defendant testified that she did not yell out during the course of the alleged assault because "I'm not a punk." Defendant further stated the officer was lying in his report and his testimony and that she was not driving while intoxicated but rather was "driving while injured." Finally, defendant admitted that, in spite of the significant trauma she sustained when her uncle assaulted her, she did not go to the hospital until the night of October 5, 2016, more than twenty-four hours after the assault.

Jason then testified, recounting that his mother called him around 11:30 p.m. on October 4, 2016, to tell him that she was "assaulted by my uncle" and "that she was lost so I was coming to get her." Jason stated that he was going to pick up his mother "somewhere on highway 287[,] like in Bridgewater." Jason said he received a second call from his mother approximately fifteen minutes later, advising that she was pulled over by the police and that he would

have to come get Amanda and Carl. Jason claimed to have seen "bruises on [his mother's] cheekbones and a knot on her forehead – all from first sight" and that he "smelled no alcohol" on her breath. Jason did not take his mother to the hospital after picking her up from the police station nor did she ask to go to the hospital.

Defendant's husband testified last, recounting that he received a call from his wife on the night of October 4, 2016, that Jason answered first. He said his wife told him she was assaulted by her uncle. He stated he told his wife to stay in the parking lot and that they would come get her, but she said she did not feel safe there.

Defendant's husband apparently accompanied Jason to the police station to pick up his wife, Amanda, and Carl, although he remained in the car. He "observed them walking out together. [Defendant] wasn't stumbling." He also did not smell alcohol on her breath nor did he hear her "slurring her speech." He did state that he observed bruises "[o]n her forehead, on her cheek . . . and I witnessed lumps and stuff on the back of her head, and on the side of her head." Despite these injuries, he said they "didn't go to the hospital . . . my wife is really not a hospital person. . . . Then she eventually [ended] up having a seizure" and went to the hospital by ambulance.

A-3698-17T4

Following the factfinding hearing, the trial court issued a written decision finding that the Division had shown, by a preponderance of the evidence, that defendant acted grossly negligent by driving Amanda and Carl while intoxicated on October 4, 2016. The court found Officer Daley "to be very credible," and found "his testimony to be wholly consistent with his report." The court also found the caseworker "to be credible," describing her testimony as "forthright," and her answers to questions as "clear and concise," with no "attempt to embellish."

The court noted there were multiple inconsistencies in defendant's statements to the Division, the BPD incident report, and her sworn testimony, and found "her to be incredible." Specifically, the court found defendant "evasive and hostile during the course of cross-examination," noting that she "was unable to recall details about the day in question on cross-examination but had been able to answer the same questions . . . during direct examination."

The court found numerous "details in her testimony that had not previously been disclosed to the Division . . . and were in fact inconsistent with her earlier reports," such as "being arrested without shoes on" and having "a large green, blue, and purple bruise on her face at the time of [her] arrest." Additionally, the court noted that "[defendant] offered no documentary evidence

11

to corroborate her version of events" and simply accused others of lying where there were details she could not explain.

The court also did not find Jason's testimony to be credible, independent of its credibility findings of defendant, noting that portions of Jason's testimony were self-contradictory while other portions sounded "rehearsed." Specifically, the court noted that both Jason and defendant's husband used "nearly identical phrasing that they were 'appalled' to learn of the alleged assault [of defendant]." The court also found that parts of Jason's testimony were "self-contradictory."

The court also did not find the testimony of defendant's husband credible and similarly noted that portions sounded "rehearsed." The court found that those portions that did not sound rehearsed directly contradicted the testimony offered by Jason. The court also found that defendant's husband similarly "attempted to embellish his story, particularly when stating what physical manifestations of the assault were present" and "attempted to exaggerate his efforts to soothe [defendant] and their discussion about taking her to the hospital, a conversation [Jason] had no recollection of hearing." The court determined the family "attempted to ensure that they gave consistent testimony, but ultimately were unable to do so."

The court found that on October 4, 2016, defendant was driving on US Highway 22 with her children, Amanda and Carl, in her vehicle. After Officer Daley observed defendant's vehicle drift between the "right fog line and the dashed lines dividing the highway," he executed a traffic stop. He asked defendant some preliminary questions and smelled alcohol on her breath. He did not observe any facial injuries on defendant and at no time did defendant indicate she had been assaulted. The officer asked defendant to exit the vehicle for field sobriety tests and found her unable to complete them successfully, when defendant either could not, or would not, follow instructions regarding the tests. As a result of Officer Daley's observations, defendant was arrested and charged with DWI and other offenses.

The court found that, "[b]ased on the competent and credible evidence, and the reasonable and common sense inferences that can be drawn from same . . . [defendant] was driving while intoxicated with [Amanda] and [Carl] in her car on October 4, 2016." The court further found that defendant "did not merely allow an intoxicated person to drive her children, but rather was the intoxicated person herself." The court concluded that the Division had established, by a preponderance of the evidence, that "[defendant] drove with her children while

in an intoxicated state" and that the "well settled law is clear that this conduct is grossly negligent." These appeals followed.

On appeal, defendant argues the record lacks sufficient evidence to support the trial court's finding of neglect, and that her conduct, in retreating with her children from the scene of an assault, was not grossly negligent, wanton, or reckless. On the cross-appeal, the Law Guardian alleges the deputy attorney general (DAG) representing the Division violated the rules of professional conduct, causing the judge to misinterpret the evidence to believe defendant did not disclose her medical records to the Division. The Law Guardian further alleges defendant was denied effective assistance of counsel, arguing her defense counsel failed to enter defendant's available medical records at trial to support her testimony that she suffered a concussion, prior to the police stopping her.

II

Title 9 controls the adjudication of abuse or neglect cases. N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citing N.J.S.A. 9:6-8.21 to -8.73). In an abuse or neglect proceeding, the Division bears the burden of proof by a preponderance of evidence adduced at a factfinding hearing, that a person has committed abuse or neglect. N.J.S.A. 9:6-8.46(b).

The standards governing our review are well known. "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom." Ibid. (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). "When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 259 (2005) (citing In re Guardianship of DMH, 161 N.J. 365, 382 (1999)). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." F.M., 211 N.J. at 448 (citing N.J. Div. of Youth & Family Servs. v. G.L. 191 N.J. 596, 605 (2007)).

Based on our review of the record, we find no basis to disturb the trial court's decision. We affirm substantially for the reasons set forth in Judge Bruce

J. Kaplan's thorough and well-reasoned written opinion. We add a few additional comments.

After defendant and the Law Guardian appealed, the Law Guardian was granted leave to supplement the record with defendant's hospital records. In a brief filed in support of this motion, the Law Guardian asserted that defendant "was diagnosed with a TBI [traumatic brain injury] and mild concussion." The Law Guardian's appellate brief repeats this same assertion; however, a careful review of the hospital record does not support this contention. The initial assessment of defendant's condition states "new-onset seizure of unclear etiology." One day later, before discharge, the updated "impression" describes defendant's injury as a "questionable mild TBI" and states "there is a question . . . whether a concussion was sustained." We agree with the Division that defendant's "medical records are devoid of any formal diagnosis of concussion or concussive-like symptoms; rather, they merely contain defendant's self-report of what she alleged happened on October 4, 2006."[4]

---

[4] Even if defendant's hospital records had contained a definitive diagnosis, the admissibility of any such medical opinion would depend on "the complexity of the analysis involved in arriving at the opinion and the consequent need for the other party to have an opportunity to cross-examine the expert." N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 130 (App. Div. 2010).

Rather than containing a definitive diagnosis that supports defendant's version of events, the hospital record contains entries that strongly support the trial court's adverse credibility findings concerning the testimony of defendant and her husband. The hospital record of the initial physical examination of defendant that addressed her head, eyes, ears, nose and throat, described these areas as "normocephalic, atraumatic." Another physical examination, less than five hours later, noted defendant complained of "tenderness to touch" in the area of her "left forehead, occipital, [and] temporal areas." Significantly, the record does not document any bruises, swelling, or other evidence of the beating defendant alleges she sustained. To the contrary, the record describes defendant's skin as "normal." Following our review of the hospital record, we conclude the Law Guardian's contention that defendant received ineffective assistance of counsel lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We also reject the Law Guardian's argument that while the Division "received [defendant's] medical records months prior to the fact-finding trial[,] the judge was never made aware of this fact by either the DAG . . . or defense counsel." As previously noted, the caseworker acknowledged, on cross-examination, that the Division did eventually receive defendant's medical

records and that the hospital records did indicate that defendant reported she had been assaulted. The record therefore fails to support the contention that the DAG violated rules of professional conduct regarding defendant's medical records.

Any arguments not addressed lack sufficient merit to warrant discussion in a written opinion. Ibid. In summary, we conclude the record contains sufficient credible evidence supporting the trial judge's determination of neglect under N.J.S.A. 9:6-8.21(c).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION