57 A.3d 572

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. T.S., DEFENDANT–APPELLANT.

IN THE MATTER OF C.R.E. A/K/A C.B., A MINOR.

Superior Court of New Jersey
Appellate Division

Submitted November 8, 2012—Decided January 11, 2013.

Before Judges SAPP–PETERSON, NUGENT and HAAS.

*Joseph E. Krakora,* Public Defender, attorney for appellant (*Janet A. Allegro,* Designated Counsel, on the brief).

*Jeffrey S. Chiesa,* Attorney General, attorney for respondent (*Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Kathryn Talbot,* Deputy Attorney General, on the brief).

*Joseph E. Krakora,* Public Defender, Law Guardian, attorney for minor C.R.E. a/k/a C.B. (*Noel C. Devlin,* Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

Following a guardianship trial at which the Division of Youth and Family Services [1] (the Division) failed to prove a cause of action for terminating defendant T.S.'s parental rights to C.B. ("Charlie"),[2] the Family Part judge ordered that the "matter as to

---

[1] On June 29, 2012, the Governor signed into law A–3101, which reorganizes the Department of Children and Families, which includes the renaming of the Division as the Division of Child Protection and Permanency. *L.* 2012, *c.* 16 (eff. June 29, 2012).

[2] We use pseudonyms to protect the parties' privacy and for ease of reference.

[defendant] ... shall revert to the FN docket [number]" and scheduled a permanency hearing before another judge. On the date of the permanency hearing, the new judge, among other things, scheduled sua sponte an abuse or neglect fact-finding hearing. Following the fact-finding hearing, the judge determined by clear and convincing evidence defendant had abused or neglected Charlie, even though the Division had not informed defendant that he was Charlie's father until eight months after Charlie's birth, had not established defendant's paternity until nearly a year after Charlie's birth, had assumed responsibility for care and supervision of Charlie shortly after he was born, and had never relinquished its care and supervision of Charlie. Defendant appeals from the abuse or neglect finding. We reverse and remand for further proceedings.

I.

When Charlie was born prematurely on September 18, 2007, he tested positive for cocaine, as did his mother, K.B. ("Kathleen"). A Division caseworker responded to a referral from the hospital and interviewed Kathleen, who identified defendant as Charlie's father, though she had not put defendant's name on Charlie's birth certificate. A week later, the caseworker learned that the address where defendant supposedly resided did not exist.

On October 3, 2007, the Division filed a Verified Complaint "pursuant to *N.J.S.A.* 9:6–8.21 *et seq.*, and *N.J.S.A.* 30:4C–12 and *Rule* 5:12–1 *et seq.*" seeking custody of Charlie and a finding that he had been abused or neglected. After recounting its previous involvement with Kathleen and Charlie's "maternal half sibling," the Division explained its involvement with Charlie, and that it could not locate defendant. Following a hearing that same day, the court entered an order placing Charlie, who by then had been determined to be medically fragile, under the care and supervision of the Division. Kathleen attended the hearing; defendant did not, as he had not been served with the complaint.

On December 13, 2007, the court ordered that Charlie remain under the care and supervision of the Division, and that he remain in the physical custody of his current caregiver. The court also scheduled a fact-finding hearing for February 2008. On the date scheduled for the hearing, Kathleen appeared and admitted that she had ingested cocaine while pregnant. Defendant again did not appear because he had not been served with the complaint.

Defendant appeared for the first time, unrepresented by counsel, at a compliance review hearing on May 29, 2008. He had been located and served with a copy of the complaint and an order to show cause approximately two weeks earlier. The court ordered defendant to complete paternity testing. The paternity test results, which were received by the Division on August 21, 2008, indicated the probability of defendant being Charlie's father as 99.99%.

At the next compliance review hearing on September 30, 2008, though defendant had retained counsel, the court entered default against him for "non-appearance." The court also ordered the Division to provide defendant's counsel with discovery. The court entered a permanency order that approved the Division's permanency plan to terminate Kathleen's and defendant's parental rights to Charlie, followed by adoption. Although the permanency order noted that Kathleen had a substance abuse issue and had refused in-patient treatment, it said nothing about defendant. The order noted that Charlie's foster family had agreed to adopt him.

Defendant failed to appear at a November compliance review hearing. He did appear with his attorney at a hearing on December 19, 2008, when the court entered an order terminating the FN action because the Division had filed a guardianship complaint the previous day. The guardianship complaint contained a single allegation against defendant:

It is the opinion of the Division that [defendant] has not been part of [Charlie's] life and has not fulfilled parental responsibilities to [Charlie]. He has not attempted to plan for his son. [Defendant] has abandoned [Charlie] to the care of others.

In addition to terminating the FN action, the court entered a case management order which, among other things, permitted defendant to visit with Charlie for two hours each week.

During case management conferences conducted periodically over the next fifteen months, the court ordered Kathleen and defendant to participate in various services and to undergo various evaluations, including medical training and substance abuse, psychological, and bonding evaluations. The court also provided for visitation between Charlie and his parents. Defendant's compliance or noncompliance with services, evaluations, and visitation schedules were central to the Division's guardianship action against him. In March 2010 the court issued a second permanency order approving the Division's plan for termination of parental rights followed by adoption.

In April 2010 the court vacated the default against defendant. The guardianship action was tried periodically between April and December 9, 2010. Although the court terminated Kathleen's parental rights, it concluded that the Division did not establish the first of the four-pronged statutory criteria contained in *N.J.S.A.* 30:4C–15.1(a)(1) for terminating defendant's parental rights. "The [c]ourt found that prong one, which states that '[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship,' was not proven by clear and convincing evidence as to [defendant]." The court did not find that defendant had abandoned Charlie to the care of others. The court ordered: "This matter as to [defendant] shall revert to the FN docket ...." The order scheduled the matter for a permanency hearing before another judge on March 4, 2011. The court subsequently denied the Division's motion for reconsideration.[3]

---

[3] Charlie's Law Guardian filed a motion for leave to appeal the court's decision that prong one of *N.J.S.A.* 30:4C–15.1(a)(1) had not been proved by clear and convincing evidence at the guardianship trial. We granted leave to appeal. Thereafter, in August 2012, the Law Guardian moved to dismiss the appeal. We granted the motion and dismissed the appeal in an order entered on August 28, 2012.

One week before the March 4, 2011 permanency hearing, defendant filed a summary judgment motion seeking custody of Charlie. He argued that because no abuse or neglect finding had been made as to him, the Title Nine action should be dismissed. He also argued that a permanency hearing was unnecessary.

During the March hearing, the Division requested permission to file an amended verified complaint "under the FN docket [to] update the Court as to what has happened from the initial filing of the FN." The Division represented that its permanency plan was "to work as was indicated by the FG order, with [defendant] towards reunification." The Division added that since it would be offering services to defendant, "a timeframe of about a year would give him significant time [for reunification]." After requesting that the court revisit the permanency plan within six months, the Division stated that its "concurrent goal is adoption." The Division did not indicate that it intended to seek an abuse or neglect fact-finding hearing.

The court rejected the Division's "concurrent plan," finding that because "the Court ha[d] just concluded a full trial on the guardianship complaint, [it was not] reasonable to now turn around and say it's a reasonable goal to terminate his parental rights. The issue seems to be one of his involvement with the services toward reunification." The court noted that there had been no fact-finding hearing as to defendant. After scheduling a date for the Division and Law Guardian to reply to the summary judgment motion or file cross-motions, the court stated, "I think then the next event after that would then be the hearing on the motions and a fact-finding hearing." [4]

---

[4] The record does not disclose why the court believed a fact-finding hearing was required when the Division had not requested one. Although the case had "revert[ed] to the FN docket" following the guardianship trial, the complaint, not the "FN" designation, framed the issues. The complaint included the Division's assertion that it had filed the action pursuant to *N.J.S.A.* 30:4C–12. At the March 2011 permanency hearing, the Division informed the court that it had

When the court suggested the status of the case was "still pre-fact-finding, so that I can ask the Division to offer services towards reunification[,]" defendant's attorney replied that defendant had completed services and "he's not willing to—I don't know—what services are they offering?" Counsel indicated that defendant would not undergo services before the fact-finding hearing. The court declined to address defendant's visitation with Charlie until it "g[o]t facts on the record where there's testimony."

The court concluded the hearing by stating it would get evidence, "maybe ... some transcripts," to have some "facts in evidence from which to make a decision." When defendant's attorney repeated his understanding that "this is a permanency hearing," the court responded, "the matter is concluded, thank you."

Following the hearing, the court issued a "Permanency Order" in which it rejected the Division's concurrent plan of termination of parental rights, continued Charlie in placement, and ordered the Division to present a new permanency plan by July 11, 2011. In an "abuse or neglect multi-purpose order" the court directed that Charlie continue under the custody of the Division, ordered that physical custody of Charlie remain in the resource home, provided for supervised visitation between defendant and Charlie, and directed that the matter be returned to the court on July 11 and 13 for hearings. With respect to the nature of the hearings, the judge checked two boxes: one describing the hearing as a "Fact-finding/Plenary Hearing," the other describing the hearing as a "Permanency Hearing."

The Division filed its amended complaint on June 11, 2011, one month before the next hearing. When the parties appeared for the hearing, the court stated:

We have some motions pending. We have a fact finding scheduled, a permanency hearing scheduled. There's an amended complaint which the Court had allowed

---

changed its permanency plan to reunification and that it intended to offer services to defendant, who remained in need of such services.

following the last hearing. It appears that of all the issues before the Court the only one that might involve having testimony or witnesses would be the fact finding.

The court then proceeded to conduct a fact-finding hearing. It did not mention that it might apply a clear and convincing standard to the evidence. In fact, during the hearing, when defendant's counsel pointed out that "there was no harm found at the guardianship trial," the court responded, "by clear and convincing evidence .... This is a preponderance standard here."

The court admitted into evidence the amended complaint with its attachments, the transcripts of the guardianship trial over defendant's objection, and other documentary evidence. Two witnesses testified: the current Division caseworker and a psychologist who had also testified at the guardianship trial.

The caseworker authenticated the Division's files and recounted the Division's involvement with defendant. Specifically, the caseworker explained that after defendant was identified as Charlie's father, the Division offered services to defendant at a family team meeting in September 2009. The services included anger management, parenting classes, and individual counseling. The caseworker also testified about Charlie's medical needs and defendant's failure to complete training to address those needs. Defendant did not complete the services at that time, but was currently "engaged in those same services."

The caseworker had observed visitation between Charlie, defendant, and defendant's girlfriend, which the caseworker considered appropriate and satisfactory. In fact, Charlie looked forward to the visits. The psychologist, who testified on defendant's behalf, could identify no harm to Charlie that had resulted from the relationship between defendant and Charlie.

Following the fact-finding hearing, the court issued a written opinion in which it found defendant had abused or neglected Charlie. Although acknowledging defendant never had custody of Charlie, the court noted that defendant "has parenting time and the child must be present for that"; and defendant "is a biological

parent of the child with parental rights not terminated." In the court's view, "[t]hat means [defendant] has control over the child. The fact that the child cannot be adopted or have his name changed without [defendant's] consent further supports the finding of control." The court concluded defendant had "control" of Charlie "for purposes of Title Nine." The court also found that after the paternity test defendant had been ordered to obtain training to meet Charlie's medical needs, but did not undergo the training, and had no legitimate reason for failing to do so. In the court's view, "[t]hat left the child in foster care as a public charge, which constitutes abandonment under Title Nine."

The court concluded that defendant's "abandonment of the child, failure to provide [ ] food, clothing, shelter and medical care, and unreasonable infliction of harm are three different bases for finding that [he] abused and neglected the child. The court makes these findings by clear and convincing evidence."

The court also found that "[t]his family clearly needs the Division to help support and strengthen its ability to function." The court determined "by clear and convincing evidence that this is a family in need of services."

The court subsequently denied defendant's summary judgment as moot. This appeal followed.

## II.

Defendant argues the court erred, and violated his right to due process, by failing to timely rule on his summary judgment motion, and by ordering sua sponte a Title Nine fact-finding hearing, when the order entered after the guardianship trial specifically returned the case to the FN docket for a permanency hearing. Although concerned about whether defendant's due process rights were violated in that context, we reverse for a different reason; the court's determination of abuse or neglect cannot stand, because despite stating explicitly that the fact-finding proceedings were governed by a "preponderance" standard, the court

made a determination based on the "clear and convincing" standard.

Indisputably, "[p]arents have a constitutionally protected right to maintain a relationship with their children." *N.J. Div. of Youth and Family Servs. v. M.M.*, 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007). Such parental rights, however, "are not absolute, and 'must be balanced against the State's *parens patriae* responsibility to protect the welfare of children.'" *N.J. Div. of Youth and Family Servs. v. G.M.*, 198 *N.J.* 382, 397, 968 *A.*2d 698 (2009) (quoting *N.J. Div. of Youth and Family Servs. v. G.L.*, 191 *N.J.* 596, 605, 926 *A.*2d 320 (2007)). When "balancing those competing concerns, a court must ensure that the statutory and constitutional rights of the parent or guardian are scrupulously protected." *Ibid.*

When, such as in this case, the Family Part "has given the Division authority and responsibility for the care and supervision of a child removed from his home pursuant to Title [Nine] and Title [Thirty], *N.J.S.A.* 9:6–8.30 and *N.J.S.A.* 30:4C–12, the Division may proceed under Title [Thirty], irrespective of a finding of abuse or neglect." *N.J. Div. of Youth and Family Servs. v. N.D.*, 417 *N.J.Super.* 96, 109, 8 *A.*3d 809 (App.Div.2010). If, however, "the abuse or neglect proceeding is terminated without a finding that the allegations in the complaint are substantiated, the Title Nine action should be dismissed after exercise of jurisdiction under Title Thirty and orders should be entered in accordance with the standards and procedures pertaining to Title Thirty litigation." *Ibid.*

Due process requires that a parent charged with abuse or neglect "have . . . adequate notice and opportunity to prepare and respond." *Ibid.; see also N.J. Div. of Youth and Family Servs. v. B.M.*, 413 *N.J.Super.* 118, 126–27, 993 *A.*2d 258 (App.Div.2010) (noting that a party cannot adequately prepare for trial where the notice does not reasonably apprise the party of the charges, or

where the issues litigated at a hearing differ substantially from those outlined in the notice).

Here, the Division filed its original complaint "pursuant to *N.J.S.A.* 9:6–8.21 *et seq.*, and *N.J.S.A.* 30:4C–12 and *Rule* 5:12–1 *et seq.*" in October 2007. In paragraph six of that complaint, which contained "[t]he facts upon which this complaint is based," the Division asserted no facts against defendant, other than a caseworker's attempt to locate him at an address that proved to be non-existent. More than a year later, when the Title Nine action was dismissed without either a fact-finding hearing or an adjudication of abuse or neglect attributable to defendant, the Division filed a guardianship complaint in which it alleged that defendant had not been a part of Charlie's life, had not fulfilled his parental responsibilities to Charlie, had not attempted to plan for Charlie, and had abandoned Charlie to the care of others.

The Division did not prove its "abandonment" theory at the guardianship trial. The Division having decided years earlier not to pursue its Title Nine action against defendant, and thereafter having failed to prove its cause of action to terminate defendant's parental rights, defendant had no reason to believe that at the "permanency" hearing in March 2011 an abuse or neglect action against him would be reinstated.

More significantly, the Division did not suggest that it intended to do so. Rather, consistent with the order entered following the guardianship trial, the Division prepared a permanency plan. When, at the March 2011 hearing, the Division informed the court that it intended to amend the complaint, its stated purpose in doing so was to "update the [c]ourt as to what has happened from the initial filing of the FN."

The Division did not file an amended complaint until three months later, in June 2011. Thus, after more than three years of litigation, defendant was served with an amended complaint and expected to prepare for a fact-finding hearing scheduled to commence one month later.

At the inception of the fact-finding hearing, defendant objected to the Division introducing the transcripts of the FG trial. In making that objection, defendant, through counsel, indicated he was "willing to go through with this fact-finding just so we can lay out the facts to the Court that there is no cause of action in this verified complaint. And . . . I would ask the Court for a dismissal. There is no cause of action in this complaint." The context of that statement is somewhat unclear. However, because one interpretation is that defendant deliberately chose to proceed with the fact-finding, based upon a belief that the Division could not sustain its cause of action, we decline to decide this appeal on due process notice grounds.

■ Nevertheless, the court improperly applied a clear and convincing standard.

The tendency of Family judges in certain circumstances to make a finding in a Title Nine case through utilization of the clear and convincing standard applicable in Title Thirty cases is not unfamiliar. Although this "gratuitous lifting" of the standard of proof would appear to provide the defendant with the advantage of putting the Division to a higher test than required by Title Nine, use of the higher standard also had the potential to abbreviate the proofs in a later Title Thirty case. *N.J. Div. of Youth & Family Servs. v. R.D.*, 207 *N.J.* 88, 118 [23 *A.*3d 352] (2011). That is, with a finding of abuse or neglect in a Title Nine case using the higher standard, the Division may be relieved of the burden of proving the first prong of a Title Thirty case so long as it is otherwise appropriate to apply the doctrine of collateral estoppel in the later case. *Ibid.*

The Supreme Court recently considered this in *R.D.*, where the trial judge in the Title Nine case found abuse or neglect by clear and convincing evidence and, in the course of a later Title Thirty case, the Division argued that the defendant should be barred from contesting a finding that he committed abuse or neglect. The Court held that the doctrine of collateral estoppel could be successfully invoked in that circumstance only if three factors were presented. *Id.* at 120–21 [23 *A.*3d 352]. Of interest here is the first such factor, which requires that the Title Nine court "must provide advance notice to the parties that, if supported by the proofs, it will make its findings using the higher Title Thirty 'clear and convincing evidence' standard." *Id.* at 120 [23 *A.*3d 352]. The record on appeal here contains no evidence that the trial judge ever advised defendant that the claim of abuse or neglect would be adjudicated through the use of the higher standard. For that reason, the judge's conclusion that the higher standard was satisfied can have no further force and effect.

[*N.J. Div. of Youth and Family Servs. v. H.P.*, 424 *N.J.Super.* 210, 223–224, 37 *A.*3d 509 (App.Div.2011).]

Our reasoning in *H.P.* applies to the facts of the case before us. During the fact-finding hearing, the court informed defendant that the "preponderance" standard applied. The court never provided defendant with notice that it would adjudicate the abuse or neglect claim through the use of a higher standard.

The Division and Law Guardian argue that the court's finding of abuse or neglect is sustainable under a lesser preponderance standard. We disagree.

Generally, we "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." *N.J. Div. of Youth and Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (quoting *M.M., supra*, 189 *N.J.* at 293, 914 *A.*2d 1265). Additionally, "[b]ecause of the family court's ... expertise in family matters, appellate courts should accord deference to family court fact-finding." *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998). We are not, however, bound by the Family Part court's legal conclusions. *N.J. Div. of Youth and Family Servs. v. I.S.*, 202 *N.J.* 145, 183, 996 *A.*2d 986 (2010).[5]

The court first determined that defendant had abandoned Charlie. While the Law Guardian "concedes that the record developed at trial does not support the legal standard for abandonment under *N.J.S.A.* 9:6–1[,]" the Division asserts a different position. The Division recounts defendant's noncompliance with

---

[5] Defendant has not challenged on appeal the trial court's admitting into evidence at the fact-finding hearing the guardianship trial transcripts. We can discern no basis for the admissibility of those transcripts. The court made no determination about the unavailability of the declarants in the guardianship action. *See N.J.R.E.* 804(b)(1) (providing the circumstances under which testimony given by a witness at a prior trial is admissible, if the declarant is unavailable to testify at the pending proceeding). We also fail to discern how the trial court could have made first-hand credibility judgments about the witnesses who testified at the guardianship trial, but did not appear at the fact-finding hearing.

services, and argues that the FG court's findings, though "not a court order per se, . . . was a clear directive . . . that [defendant] take action as [Charlie] was being harmed by his delay in completing necessary services." The Division then reasons that when defendant appeared in court on March 4, 2011, and declined services absent an abuse or neglect finding, he effectively chose "to leave [Charlie] in foster care to be supported and maintained at the expense of the public from December 9, 2010 through March 4, 2011." The Division contends that under Title Nine, "this was all that was required to uphold a finding of abandonment."

A child is "abused or neglected" under *N.J.S.A.* 9:6–8.21(c)(5) when the child has been willfully abandoned by his parent. A parent who has custody or control of a child abandons that child by

> failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child care in societies or private persons not legally chargeable with its or their care, custody and control.
>
> [*N.J.S.A.* 9:6–1.]

" 'The statutory notion of abandonment . . . import[s] any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.' " *Lavigne v. Family and Children's Soc'y of Elizabeth,* 11 *N.J.* 473, 480, 95 *A.*2d 6 (1953) (quoting *Winans v. Luppie,* 47 *N.J. Eq.* 302, 304, 20 *A.* 969 (E. & A.1890)). Even if defendant had custody or control of Charlie, the statement defendant's attorney made at the March 2011 permanency hearing, that "as it stands, we're not agreeing to any services, pre-fact-finding," can hardly be considered conduct on defendant's part evincing a settled purpose to forego all parental duties and relinquish all parental claims to Charlie, particularly in view of the evident confusion about the nature of that hearing. This is particularly so considering defendant had filed a summary judgment motion to have Charlie returned to him.

The court also found that defendant's failure to engage in appropriate medical training, and failure to provide food, clothing, shelter and medical care, and unreasonable infliction of harm, resulted in his abuse and neglect of Charlie. Although not entirely clear, the court appeared to find that those facts established abuse or neglect under *N.J.S.A.* 9:6–8.21(c)(4), which defines an abused or neglected child as one

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent ... to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so.

Defendant never had custody of Charlie. There is no indication that Charlie had been deprived of food, clothing, shelter and medical care, or that defendant's noncompliance with some services provided by the Division posed an imminent danger to Charlie. Indeed, it is difficult to conclude that Charlie was at risk of imminent danger when he was being cared for by resource parents under the supervision of the Division.

The court also cited to defendant's expert's testimony that "there would be difficulty in transferring custody of the child away from the foster parents" as exemplifying "the harm of leaving a child in foster care for too long." The court made no attempt, however, to explain or differentiate the multiple factors resulting in the delay of returning Charlie to his parents, such as Kathleen's substance abuse and the Division's failure to make adequate attempts to locate defendant after Kathleen identified him as Charlie's father. In short, the court's conclusions were not supported by competent evidence.

Although we reverse the Title Nine abuse or neglect finding, we do not conclude that defendant's summary judgment motion should have been granted. In addition to the abuse or neglect finding, the court found "that this is a family in need of services." Consequently, the court continued to exercise jurisdiction under

Title Thirty. Defendant has not challenged the court's decision under Title Thirty.

Reversed and remanded. We do not retain jurisdiction.