**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3076-17T4

LANA SAMPSON,

    Plaintiff-Respondent,

v.

SHAY SAMPSON,

    Defendant-Appellant.

_____

           Argued May 21, 2019 – Decided July 18, 2019

           Before Judges Rothstadt and Natali.

           On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-1463-16.

           Ronald Glenn Lieberman argued the cause for appellant (Cooper Levenson, PA, attorneys; Ronald Glenn Lieberman, on the briefs).

           David Thornton Garnes argued the cause for respondent.

PER CURIAM

In this post-judgment dissolution matter, defendant Shay Sampson appeals from the Family Part's January 31, 2018 Amended Final Judgment of Divorce (JOD) that awarded plaintiff Lana Sampson spousal support for a period of ten years, equitably distributed the parties' marital property and debts, and awarded plaintiff counsel fees. On appeal, defendant argues that the trial court erred in not "uphold[ing a] separation agreement" the parties signed; that its award of alimony to plaintiff was improper because it "over-imputed income" to defendant and "under-imputed income" to plaintiff; and that it erred in "making vague and subjective statements" about the parties' marital standard of living. Defendant also contends that the trial court's implementation of wage garnishment to satisfy his alimony obligation was improper; that it abused its discretion in equitably distributing the parties' assets and debts; that it should not have ordered him to maintain life insurance; and that it improperly awarded attorneys' fees. We disagree and affirm.

The parties were married in 1999 and had two children: a daughter, born in 1993, and a son, born in 1996. Both children are emancipated.

In March 2015, the parties signed a separation agreement. Defendant prepared the agreement, neither party had an attorney review it, and plaintiff signed it on the day she received it. While defendant contended that the

A-3076-17T4

agreement was fair, plaintiff did not, but nevertheless signed it because she felt that she needed to leave the house due to an "extremely hostile environment" and defendant's "identifi[cation] as mentally disabled."

The agreement stated it was "intended to settle the matters addressed" but "not be incorporated into a final decree of divorce," as "a subsequent separation agreement will have to be made and duly incorporated into" the final decree. It provided that neither party would be entitled to alimony, regardless of any changed circumstances that may arise. The agreement also stated that defendant would temporarily reside in and have possession of, and assume the costs related to, the marital home.

As to marital assets, the agreement stated that the parties were in possession of those assets to which they were entitled, and distributed the remaining furniture, electronics, and personal items. Regarding debts, the agreement provided that any indebtedness secured against or attributable to an item of property would be the responsibility of the party receiving that property. In addition, defendant assumed $2000 in debt "created by [defendant] only" and plaintiff assumed the $19,000 balance on a car loan, half of their son's college tuition in the amount of $3450, and $5000 in "personal debts et all" (sic). Under the agreement, the parties would be equally responsible for any debt owed to the

3

Internal Revenue Service (IRS) and for the balance of their son's college tuition. Additionally, the agreement awarded plaintiff $2000 in unspecified payments, $200 in moving expenses, $570 for a car payment, $3100 toward an electric bill, and $1900 toward a gas bill, as well as permitted her to remain on defendant's health insurance plan.

On June 6, 2016, plaintiff filed a complaint for divorce.[1] A non-consecutive, four-day trial followed in 2017. The facts as ascertained from the testimony at trial are summarized here.

Plaintiff has a master's degree in educational administration and during the marriage, worked various full-time jobs, including serving as an assistant principal in two different school districts between 2004 and 2010. In 2010, she earned $103,984; however, in 2011, she resigned from her job and her income decreased to approximately $66,000. At the time of trial, she worked as a substitute teacher, tutor, and lifeguard, and estimated that she earned $40,000 per year.

Plaintiff testified to a bleak financial situation, explaining that she had over $212,000 in student loans that were on deferment and that she was unable

---

[1] The parties do not provide a copy of this complaint or any resulting answers or motions.

A-3076-17T4

to pay her bills, her car had recently been repossessed, and that it was "incredibly difficult for [her] to survive over the course of this time." Plaintiff also described an incident where the parties received a $17,000 tax refund that triggered an audit, which resulted in the parties having to repay a portion of the refund they received. The parties were still in arrears and plaintiff paid fifty dollars per month toward the amount owed, while defendant had not contributed any amount.

Plaintiff testified that the parties enjoyed a "very high standard of living" during marriage. They "went out often," "went on vacation every year," and went to "[v]ery expensive restaurants." Plaintiff spent approximately $300 per month on clothing during the marriage and had "high end cars" and a pool and jacuzzi. Plaintiff stated that her current income was over $2000 per month less than her expenses.

Plaintiff sought alimony in the amount of $553 per week, the difference between her expenses and her income. Plaintiff conceded that the $23,000 in student loans that she took out prior to marriage should be her sole responsibility, but sought equitable distribution of the $189,000 remainder. Plaintiff also requested that defendant pay approximately $29,000 for their daughter's student loan, alleging that she had no involvement in the decision to

 A-3076-17T4

take out that loan and had not spoken to her daughter in five years.  Additionally, of their son's $40,000 in student loans, defendant paid approximately $17,000 and plaintiff stated that defendant should pay the remainder of the loan as well.

From 2000 to 2009, defendant worked as a police officer, earning between $110,000 and $120,000 per year.  Since leaving the police force, defendant has received a tax-free pension of $51,000 per year.

While receiving his pension, defendant owned and operated an automobile business, Sampson Motors, since 2013.  The parties' son worked with defendant in the business and testified that in the course of business, defendant would attend automobile auctions, where defendant purchased between twenty and thirty cars per month at approximately $1000 to $1500 per car.  After spending approximately $500 to repair each car, defendant would sell them on Craiglist or Facebook Marketplace, both of which are free to use, for $1500 to $3000 per car.  The son stated that defendant sought "cash in hand buyers only" and used his, his sister's, and other business partners' names when purchasing cars as a "tax relief."

Defendant testified that, contrary to his son's testimony, he sold only fifty-one cars in 2016, and since 2013, he had not made a profit from selling cars due to having to repay investors and pay rent, insurance, repairs, and other costs.

A-3076-17T4

Defendant's 2016 tax return allegedly reflected that his business suffered a negative operating loss of $15,015, and defendant testified that it operated at a deficit. Defendant explained that the deposits in his business and personal bank accounts were significant because he would receive money from an investor to purchase a vehicle, deposit that money into his account, and immediately withdraw it via bank check that was then paid to the auction. According to defendant, his primary income since May 2015 was his pension, and his Case Information Statement (CIS) indicated that his pension was his only income.

Defendant requested that the parties' separation agreement -- specifically, the provision that neither party would be entitled to spousal support -- be honored. Defendant also sought to enforce the provisions in the separation agreement stipulating that the marital home was valued at $317,000 and that it had a primary mortgage balance of $147,000 and a home equity loan of approximately $70,000.

The trial judge issued her oral decision on December 15, 2017. In her decision, the judge made specific credibility determinations and found the son's testimony regarding defendant's automobile business to be credible and that defendant's testimony "was by all accounts not reliable and not credible." The judge observed that despite owning his business for several years, defendant

"never once filed a tax return that indicated he made one dollar from this car business," which the judge found "to be not credible in any way, shape, or form." Defendant appeared to have never filed tax returns until the court asked him to provide them, at which point the judge found that he "r[a]n to the accountant and ha[d] tax returns drawn up that pretty much showed that everything balanced out." While testifying, defendant "dodged the questions, he didn't answer them truthfully, he smirked, he sneered, he just felt like all of this [wa]s beneath him[.]" His CIS also stated that he had expenses over $70,000, despite alleging that he made only $51,000 per year. The judge estimated that defendant earned approximately $150,000 per year selling cars.

The judge also found plaintiff to not be "[one hundred] percent reliable." The judge concluded "it [did]n't make sense . . . that a person who has a Master's in [E]ducation and can make up to $100,000 is not working up to her full capacity and is simply being a lifeguard."

Regarding the pre-trial separation agreement, the judge found it was "forced upon" plaintiff and "put her in a situation where she was out of the house, her expenses were not being paid, and she was in a one-bedroom apartment." The judge stated the following:

> [D]efendant forced an agreement upon the plaintiff to
> agree that there would be no spousal support when they

separated. I don't find that that agreement is binding on the parties at this juncture because . . . the agreement states clearly that at the time of the divorce, all of this was going to be addressed and that the agreement was only for the period of the separation. So I don't find that has any bearing on this except for the fact that the defendant was able to figure out how not to pay the plaintiff any spousal support and I think that was because she wanted the home maintained and he had indicated that he was going to maintain the home at that time.

Turning to the issue of alimony, after imputing annual income of $70,000 to her, the judge found that plaintiff could not maintain the marital standard of living and "should not have to live in a one-bedroom apartment while the defendant lives in a house and spends money." The judge considered the statutory factors for an award of spousal support, finding that defendant had the ability to pay because "he makes $200,000 tax free[.]" She found both parties were healthy and that neither provided any evidence of disabilities that would allow her to draw a conclusion about their abilities to work. The marital standard of living was high, including a large home with a pool in an area with a high cost of living, and defendant has been able to maintain this standard since the divorce but plaintiff has not. Both parties had adequate earning capacities and neither have been absent from the job market in recent years. The judge awarded alimony in the amount of $500 per week for ten years, to be paid

through a wage execution against defendant's pension. Due to the alimony obligation, defendant would also be obligated to obtain a $200,000 life insurance policy.

The judge determined that equitable distribution should be equal. She valued the marital home at $317,000 as the parties had stipulated in the separation agreement, and declared defendant responsible for any loans above the first and second mortgages, which would be both parties' responsibilities.

The judge ordered defendant to pay all mortgage, tax, and upkeep payments and immediately refinance the first and second mortgages, after which any equity between the value of $317,000 and the two mortgages would be split equally. If defendant could not refinance the marital home within sixty days, he would be required to put it on the market. Any liens other than the two mortgages would be defendant's responsibility, unless they were based on plaintiff's student loans. Those loans would be plaintiff's responsibility and any of the children's loans that defendant co-signed would be his responsibility. The rest of the children's loans would be the children's responsibility.

The parties' past tax debt was also to be shared equally, but any future tax consequences due to defendant not having paid taxes relating to his automobile business would be his alone. Any other debt that was not joint debt, such as

10

credit cards, would be the responsibility of the party in whose name the debt was acquired. The judge later entered the JOD and this appeal followed.

We begin by acknowledging that "we accord great deference to discretionary decisions of Family Part judges." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012). Because of the Family Part's expertise in family matters, our review of a Family Part judge's fact-findings is limited. See N.J. Div. of Youth & Family Servs. v. T.S., 429 N.J. Super. 202, 216 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)); N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010). We generally defer to factual findings made by a trial court when such findings are supported by adequate, substantial, and credible evidence. Gnall v. Gnall, 222 N.J. 414, 428 (2015). We owe substantial deference to Family Part judges' findings of fact because of their special expertise in family matters, Cesare, 154 N.J. at 413, especially where the evidence is largely testimonial and rests on the judge's credibility findings. Gnall, 222 N.J. at 428.

Accordingly, we will only reverse a trial court's factual findings when they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting

11

Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).  In contrast, "trial judge[s'] legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review."  Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Applying our discretionary standard, and in light of the judge's specific credibility findings, we find defendant's challenges to her rulings to be without merit.  We affirm substantially for the reasons expressed in the trial judge's oral decision.  We add only the following comments regarding the award of counsel fees.

As to fees, the judge found that an award was warranted based primarily upon defendant's bad faith.  The judge explained her reasoning by stating the following:

> I have found that he has demonstrated extreme bad faith, there was overreaching in the agreement, there was general non-responsiveness and non-forthcoming testimony as well as the fact that I find the[re] were flat out lies and shady business practices, non-payment of taxes.  I mean, and the fact that we're even here when this case could have been settled except for the defendant's bad faith, I will also order the amount of $5,000 in attorneys['] fees and that is to be paid within 60 days.

The decision to award attorneys' fees in a family action lies within the discretion of the trial judge. R. 5:3-5(c); Addesa v. Addesa, 392 N.J. Super. 58, 78 (App. Div. 2007). That determination will be disturbed "only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).

"In a family action, a fee allowance . . . may be made pursuant to [Rule] 5:3-5(c)." R. 4:42-9(a)(1). When determining an award of fees, Rule 5:3-5(c) provides that a court should consider:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

"In a nutshell," in awarding counsel fees, the court must consider

> whether the party requesting the fees is in financial need; whether the party against whom the fees are sought has the ability to pay; the good or bad faith of either party in pursuing or defending the action; the nature and extent of the services rendered; and the reasonableness of the fees.

13

[Mani v. Mani, 183 N.J. 70, 94 (2005).]

Although the judge's discussion of the Rule 5:3-5(c) factors was limited, it is clear that it was premised on the relevant factors, including plaintiff's financial need, defendant's ability to pay, and, again, defendant's, bad faith in defending the action. Bad faith "suggest[s] an improper motive [and] implies something more than a showing of a mistaken, unreasonable or frivolous position . . . . It requires a party to have malicious motives, to be unfair, to desire to destroy the opposing party, [or] to use the court system improperly to force a concession not otherwise available." Kelly v. Kelly, 262 N.J. Super. 303, 308 (Ch. Div. 1992). As the trial judge stated, defendant used the court system improperly, testified untruthfully, and desired to "destroy" plaintiff through his apparent efforts to conceal his income in order to avoid paying spousal support.

The judge's findings of bad faith and the financial circumstances of the parties were amply supported by the record. We discern no abuse of the trial judge's discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3076-17T4