# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0734-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

JE.F.,[1]

     Defendant,

and

JO.F.,

     Defendant-Appellant.

_____

IN THE MATTER OF J.F.
and N.F., minors.

_____

Submitted February 13, 2024 – Decided March 11, 2024

Before Judges Rose and Perez Friscia.

---

[1] We use initials and fictitious names for the parents and children to protect their privacy and the confidentiality of the record. R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FN-14-0051-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sara M. Gregory, Assistant Attorney General, of counsel; Wesley G. Hanna, II, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (Maria Emilia Borges, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant JO.F. (Joe) appeals from a September 22, 2022 Family Part order terminating protective services litigation following a December 21, 2021 fact-finding determination that he abused or neglected his twin children, N.F. (Neil) and J.F. (Jim). Joe argues the judge erred because he was not grossly negligent, did not place the children at imminent risk of substantial harm, and was denied due process. Having reviewed the record, we conclude the judge's decision was supported by substantial credible evidence in the record and consistent with applicable law. We affirm.

I.

Joe and his wife, co-defendant JE.F. (Jill),[2] share twins Neil and Jim, born in July 2013. They had all resided with Jill's son from a previous relationship, W.I. Jill also had a daughter from a previous relationship, L.I., who resided with her biological father.

On March 18, 2021, a school employee made a referral to the New Jersey Division of Child Protection and Permanency (Division) reporting concerns for Jim and Neil's welfare after Jim advised a teacher that his parents were fighting. According to the referral, Jim informed "his teacher that he was upset" because his parents had argued, and his father threw a computer. Jim had trepidation in discussing the incident but eventually expressed that his father was often angry, fought with his mother, and became violent. Additionally, after speaking with Neil's teacher, the referent relayed Neil had visited the school psychologist twice that week because he was drawing pictures of guns in class and cutting up crayons to "mak[e] ammunition."

The next day, the Division's investigative caseworker visited Jim and Neil's elementary school and interviewed them. The twins separately relayed that their parents frequently argued and cursed at each other. Jim relayed "that during the last fight," Jill was lying on the couch while Joe stood and "put a gun

---

[2] Jill is not a party to this appeal.

A-0734-22

to his head." Similarly, Neil confirmed Joe had weapons in the house and had "put a gun to his head and threatened to shoot himself the last time he had a fight with [Neil's] mother." Neil witnessed the incident while Jim fearfully hid behind him.

After the interviews, the caseworker called Jill, informing her of the investigation. Jill confirmed that during the previous weekend, Joe had put a gun to his head and threatened to kill himself. Jill relayed that Joe was depressed and heavily "under the influence of alcohol during the argument."

The caseworker contacted the local police department to complete a welfare check on Joe after Jill advised he was home and likely drinking. The police responded to the home without the Division due to Joe's possible intoxication and possession of firearms. Sergeant Brian Szymanski met Joe outside the home and observed he appeared intoxicated. Szymanski obtained consent to search the house, and the search yielded multiple firearms and a crossbow. Joe accompanied police to headquarters, agreeing to be transferred to the hospital for an evaluation. The Division contacted Jill, who advised that she was applying for a temporary restraining order (TRO) against Joe. Jill obtained a TRO, but it could not be served until Joe finished detoxing the next day.

A-0734-22

The caseworker met with Joe at the hospital before his release. Joe stated he could not recall how much he had imbibed, but he had no intention to shoot himself. Joe acknowledged the boys were in the house but claimed he did not know whether they witnessed the incident. Joe admitted placing the children at risk of harm by putting the gun to his head.

On March 22, Jill signed a Division Safety Protection Plan (Safety Plan) providing that Joe would not have contact with Jim and Neil until completion of a mental health and substance abuse assessment. Eight days later, Joe signed the Safety Plan. Joe also signed a Case Plan Family Agreement, agreeing to comply with the mental health treatment recommendations and that the Division's case would remain open pending completion.

On April 14, the Division filed an order to show cause and a verified complaint seeking the care and supervision of Neil and Jim. The complaint alleged in pertinent part that Joe abused or neglected his children "as the result of the failure . . . to exercise a minimum degree of care . . . in providing the children with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof." The parties waived their right to a hearing and consented to Joe's no contact restraints. Joe and Jill consented to undergo the requisite psychological and substance use disorder

evaluations. The judge entered an order that: permitted the Division to maintain care and supervision of Jim and Neil; required supervised parenting time between Joe and the children; required Joe to submit to a substance abuse assessment and the treatment suggested; and mandated Jill and Joe remain in weekly contact with the Division.

The judge held case management conferences on June 10, August 19, and September 15. Recognizing Joe's willingness to engage with the Division's services, the judge stated: "[Y]ou impress me, sir, with your desire to get help"; and the "reports regarding [Joe] . . . [we]re really glowing." The Division retained care and supervision of Jim and Neil while increasing Joe's parenting time.

On October 19 and November 9, the judge conducted a fact-finding hearing. The caseworker testified for the Division, relaying that during her initial conversation with Jim, he stated: "during the last fight his parents had," his father "put a gun to his head." Jim knew it was a real gun, not a toy gun. The caseworker relayed Jim had heard his mother say "blah, blah, blah, gun to your head in front of the children." Jill had advised that the police were not called because Joe's actions quickly deescalated, and she would call the police if it happened again. Jill did not believe defendant would shoot himself because

he had made the same threat on prior occasions.

The Division also called Szymanski, who testified the police confiscated weapons for safekeeping by consent and regarding Joe's mental health hospital intake. After Szymanski arrived at the family's home, Joe came outside, was patted down, and a black pocketknife was collected. Joe appeared intoxicated, which Szymanski noted "[wa]sn't a crime." At first, Joe denied remembering his actions from the weekend, but eventually admitted to putting a gun to his head. It was undisputed police recovered firearms from a toolbox.

At the conclusion of the hearing, Joe's counsel objected to the admission of the Division's investigation summary, arguing "it contain[ed] hearsay, double hearsay," and that it contained "several pages which recount information . . . contained in hospital records." The judge granted in part the objection, pursuant to Rule 5:12-4, sustaining the objection as to any complex medical diagnosis in the record.

On December 15, after considering written summations, the judge rendered an oral decision. He found "by a preponderance of the evidence . . . [Joe]'s actions constituted, at the very least, wanton and gross negligence." The judge reasoned it was undisputed Joe "wielded a loaded firearm while intoxicated, holding it to his head and threating to kill himself . . . within the

7

family home." Focusing on whether Jim and Neil "would suffer physical and emotional harm," the judge concluded "imminent risk of harm [was] clear," and "it would [have] been far too simple to accidentally fire the weapon and cause untold damage." The judge found the incident also "caused emotional harm to both [Jim] and [Neil]."

In his December 21 order, the judge held defendant abused or neglected his sons pursuant to N.J.S.A. 9:6-8.21(c). The judge further held: "[Joe]'s conduct during the weekend of March 13, 2021, caused emotional/mental impairment and [i]mminent danger and substantial risk of physical and emotional impairment to [Neil] and [Jim] and for the other reasons placed on the record."

The judge clarified he made no finding against Jill, "as no claims of abuse or neglect ha[d] been made against" her. Thereafter, the judge entered compliance review orders on April 28, and June 15, 2022. On September 22, the judge terminated the litigation because "the children . . . remain[ed] in the home, [and] conditions ha[d] been remediated." Both Joe and Jill retained legal and physical custody of the children.

On appeal, Joe argues the judge's finding that he abused or neglected his children was erroneous because: he suffered a mental health emergency that

was not grossly negligent conduct, the children were not in imminent risk of substantial harm, and he was denied due process notice that he was accused of causing actual harm.

## II.

The appellate standard of review of a Family Part judge's factual finding is "strictly limited." N.J. Div. of Youth and Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010) (citing Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "[W]e apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence." N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021). "This deferential standard of review is appropriate because the Family Part judges are presumed to have a 'specialized knowledge and experience in matters involving parental relationships and the best interests of children.'" N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012)). Thus, we are bound to accept the trial court's factual findings that are supported by "'adequate, substantial, credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 155 (App. Div. 2018) (quoting N.J. Div. of Child Prot. &

Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017)); see also N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (holding findings are entitled to deference "unless it is determined that they went so wide of the mark that the judge was clearly mistaken").

However, "[w]here the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' we expand our scope of review." N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019) (quoting G.L., 191 N.J. at 605). We owe no deference to a judge's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

Regarding evidentiary rulings, "we afford '[c]onsiderable latitude . . . [to a] trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'" N.B., 452 N.J. Super. at 521 (alteration in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016)). Also, where "objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates the potential weakness of such proofs,

and takes that into account in weighing the evidence." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016).

"The prevailing concern in abuse and neglect cases is the best interests of the child." N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146 (App. Div. 2016); see also N.J.S.A. 9:6-8.8(a) (providing that under Title Nine, children's safety is "of paramount concern and the best interests of the child shall be a primary consideration"). "The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 328 (App. Div. 2011). "An analysis of a parent's conduct must account for the surrounding circumstances." N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015).

An abused or neglected child is one:

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

> [N.J.S.A. 9:6-8.21(c).]

"The phrase 'minimum degree of care'" under the statute "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 178 (1999); see also N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 305 (2011). "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S., 157 N.J. at 181-82. When interpreting evidence, judges must not "fill in missing information on their own or take judicial notice of harm." N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 469 (App. Div. 2014) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 28 (2013)).

"Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." G.S., 157 N.J. at 178. "A parent who fails 'to exercise a minimum degree of care' by unreasonably allowing harm to be inflicted on a child is accountable under the statute." J.R.-R., 248 N.J. at 370 (quoting N.J.S.A. 9:6-8.21(c)(4)). "[W]here a parent or guardian acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger." T.B., 207 N.J. at 307. "That assessment must consist of a particularized review of a parent's or caretaker's actions and the impact of any act or omission on the

child." E.D.-O., 223 N.J. at 180. The Division bears the burden of proving by a preponderance of the evidence a parent abused or neglected a child. J.R.-R., 248 N.J. at 358. To sustain that burden of proof, the Division may seek to admit "competent, material and relevant evidence." Id. at 369 (quoting N.J.S.A. 9:6-8.46(b)).

## III.

Joe's contentions that his conduct only constituted a "medical emergency," and he was not grossly negligent causing an imminent risk of substantial harm to his boys are unsupported in the record. As an initial matter, a parent's mental health condition and the suffering of a "mental health crisis" does not by itself dictate a finding of abuse or neglect. See F.M., 211 N.J. at 450 ("Mental illness, alone, does not disqualify a parent from raising a child."). Here, the record contains no expert opinion providing a medical diagnosis of Joe's condition and the Division did not argue a mental illness prevented proper supervision or created imminent damage. The judge correctly engaged in the required fact-sensitive inquiry regarding Joe's intoxicated state and his surrounding conduct in front of his children. Joe's actions were "evaluated in context based on the risks posed by the situation." T.B., 207 N.J. at 309.

A-0734-22

We are also unpersuaded by Joe's contention that the judge wrongly applied "Title [Nine] as a strict liability statute," inferring risk of harm from his conduct which resulted from a mental health emergency. See E.D.-O., 223 N.J. at 180 ("Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." (quoting G.S., 157 N.J. at 178-79)). The judge found "uncontested, unrebutted, that during the weekend of March 13th . . . [Joe] wielded a loaded firearm while intoxicated, holding it to his head and threatening to kill himself during a verbal altercation with his wife." He found the caseworker's testimony credible regarding Jim's and Neil's accounts of the events, which were corroborated by Joe's admission he was "highly intoxicated" and "point[ed] a gun to his head." The judge also credited Jill's and Szymanski's testimony that a handgun was located at the residence with "live rounds in the magazine," thus corroborating Jim's and Neil's accounts of the event. These factual findings sufficiently established the children were present and Joe's actions "presented an unimaginable risk" to the boys.

We further reject Joe's contention that the judge's abuse or neglect findings were erroneously based on inadmissible "hearsay found in the agency's

14

reports" that included "uncorroborated child hearsay." It has long been established that "the Division may submit into evidence 'reports by [Division] staff personnel . . . prepared from their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the [Division].'" N.T., 445 N.J. Super. at 493 (alterations in original) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 595 n.1 (1986)).

In Title Nine proceedings, a child's hearsay statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). The statute "constitutes a statutorily created exception to the hearsay rule but independent evidence of corroboration is required in order to find abuse or neglect." N.B., 452 N.J. Super. at 522. We review de novo a court's determination that a child's hearsay statements have been sufficiently corroborated under N.J.S.A. 9:6-8.46(a)(4). A.D., 455 N.J. Super. at 156. "The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." Id. at 157 (quoting N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)).

A-0734-22

Here, the caseworker testified she responded to the school the day of the referral and interviewed both children. She heard firsthand each child's account of Joe's actions. The same day, Jill confirmed the children's factual recitation of Joe's behavior. Later, Joe admitted to the caseworker that, in front of the children, he put a loaded gun to his head, thus corroborating their statements. Admitting the caseworker's investigation summary into evidence, subject to the exclusion of incorporated medical diagnoses pursuant to N.J.R.E. 803(c)(6) and 808, was not an abuse of discretion. We find no reason to disturb the judge's cogent factual findings, which supported his decision that Joe's actions were "grossly and wantonly negligent," and his application of the law determining "abuse and neglect ha[d] been substantiated."

The record belies Joe's contention that the judge's finding of "actual harm" "deprived him of due process." The Division's complaint averred that he committed abuse and neglect by "unreasonably inflicting or allowing to be inflicted harm, or [a] substantial risk thereof." The Division asserted that Joe's intoxicated actions in front of his children of arguing with Jill and threatening to shoot himself with the handgun to his head created a substantial risk of harm. The Division's complaint alleged the children suffered direct emotional ramifications, including Neil seeing a "school psychologist . . . twice that week

because he had drawn pictures of guns in class and was cutting up crayons . . . to make ammunition" and Jim reporting "he was scared."

"At a minimum, 'due process requires that a parent charged with abuse or neglect have adequate notice and opportunity to prepare and respond.'" N.J. Div. of Youth & Fam. Servs. v. P.C., 439 N.J. Super. 404, 412 (App. Div. 2015) (quoting N.J. Div. of Youth & Fam. Serv. v. T.S., 429 N.J. Super. 202, 213 (App. Div. 2013)). "There can be no adequate preparation [for trial] where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice." N.J. Div. of Youth & Fam. Serv. v. B.M., 413 N.J. Super. 118, 127 (App. Div. 2010) (alteration in original) (quoting H.E.S. v. J.C.S., 175 N.J. 309, 322 (2003)).

The Division's ninety-eight-page complaint sufficiently provided Joe with notice of the alleged abuse or neglect and outlined in detail the "facts upon which th[e] complaint [wa]s based." The judge's well-reasoned and cogent findings that Joe's conduct "caused emotional/mental impairment and [i]mminent danger and substantial risk of physical and emotional impairment" was supported by substantial credible evidence in the record. Further, our Supreme Court has held "we do not require expert testimony in abuse and neglect actions. In many cases, an adequate presentation of actual harm or imminent danger can be made

without the use of experts." <u>A.L.</u>, 213 N.J. at 29. Again, we discern no reason to disturb the judge's well-reasoned decision.

To the extent we have not otherwise addressed any of Joe's arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

18