# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4736-15T2
           A-4739-15T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

H.H. and C.R.,

    Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
K.H., J.H., and D.H.,

    Minors.

_____

Submitted May 4, 2020 – Decided July 13, 2020

Before Judges Messano and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0094-15.

Joseph E. Krakora, Public Defender, attorney for appellant H.H. (Robyn A. Veasey, Deputy Public Defender, of counsel; Laura Orriols, Designated Counsel on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant C.R. (Robyn A. Veasey, Deputy Public Defender, of counsel; Christine Olexa Saginor, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa Dutton Schaffer and Donna Sue Arons, Assistant Attorney Generals, of counsel; Joshua Paul Bohn, Deputy Attorney General, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors D.H. and J.H. (Meredith Alexis Pollack, Assistant Deputy Public Defender, of counsel; James Joseph Gross, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor K.H.  (Meredith Alexis Pollack, Assistant Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the briefs).

PER CURIAM

Following trial, the Family Part entered its May 5, 2016 judgment of guardianship terminating the parental rights of defendants, H.H. (Harry) and C.R. (Carmela), to their three children, D.H. (Debbie), born January 2003, J.H.

(Jack), born August 2005, and K.H. (Kathy), born July 2007.[1]  Defendants moved for reconsideration, which the judge denied.

Defendants appealed, arguing the Division of Child Protection and Permanency (the Division) failed to produce clear and convincing evidence satisfying all four prongs of the statutory best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a)(1)-(4).  In addition, Harry contended the judge mistakenly admitted, over his objection, certain Division evaluation reports, because she concluded the Division's expert psychologist, Dr. Barry Katz, relied upon them in rendering his opinions at trial.  Harry asserted the judge's mistaken conclusion about the bases for the expert's opinions rendered Dr. Katz's opinions unworthy of belief.  The children's Law Guardian specifically joined in challenging the sufficiency of the prong three and four evidence and urged us to reverse the judgment.

While the appeal was pending, the resource parent, who at the time of trial had indicated a willingness to adopt all three children, changed her mind as to Debbie and Jack, both of whom had displayed serious behavioral problems in the interim.  Defendants moved before us to summarily reverse the judgment of

---

[1] We use pseudonyms and initials throughout the opinion pursuant to Rule 1:38-3(d)(12).

guardianship, or, in the alternative, for a limited remand to the Family Part to consider a motion to vacate the judgment pursuant to Rule 4:50-1 based upon this change in circumstances. We granted the alternate relief and stayed appellate proceedings pending defendants filing motions in the Family Part to vacate the judgment, which they did.

A different judge heard oral argument on the motions. In a comprehensive oral opinion outlining the parties' arguments and the developments since entry of the judgment, the judge noted that Debbie and Jack now had "no reasonable prospects of being adopted into the same home." She decided to reopen the guardianship docket based on "newly discovered evidence[,]" and, in granting what she characterized as "relatively narrow" relief, the judge allowed Dr. Katz "the opportunity to review the newly discovered information and determine if this change in circumstances would affect his opinion as it was presented to the [t]rial [c]ourt." The judge denied defendants' other requests for new bonding evaluations and to vacate the judgment and grant them visitation.

Dr. Katz's initial supplemental report indicated a need to conduct further evaluations, and the judge subsequently entered orders permitting them. She continued to deny, however, defendants' requests for new bonding evaluations.

The judge granted the Law Guardian's motion to hold a plenary hearing, which was conducted over four non-consecutive days between April and July 2018.[2]

On September 21, 2018, the judge entered an order granting defendants' motion to vacate the judgment of guardianship as to Debbie and Jack, but she denied the motion as to Kathy. Defendants filed amended notices of appeal seeking review of this order. The Division did not file a cross-appeal. As a result, we only consider the arguments raised by defendants as to the termination of their parental rights to Kathy.

In addition to the points on appeal he originally raised, Henry now contends the remand judge erred by limiting the development of a full record regarding potential reunification with Kathy, while at the same time concluding that reunification with Debbie and Jack was possible. He also argues that this limitation on the scope of the remand hearing, along with the Division's bad faith during trial, denied him due process. Carmela reasserts her arguments regarding the insufficiency of the evidence supporting termination. She also contends that the remand judge misapplied the Court's holding in In re Guardianship of J.N.H., 172 N.J. 440 (2002), regarding a Rule 4:50-1 motion to

---

[2]  Recognizing a potential conflict between Kathy's interests and those of her siblings, the judge wisely appointed a different Law Guardian to represent Kathy.

vacate, and the judge erroneously focused her attention on whether the initial judgment was correct, rather than whether it remained fair and equitable under the changed circumstances.

The Division asserts that the trial evidence satisfied its burden of proof as to all four prongs of the statutory test, and that the additional evidence on remand continued to support the judgment of guardianship. Kathy's Law Guardian's supplemental brief urges us to affirm the judgment.

We have considered these arguments and affirm.

## I.

Caseworkers assigned to the family testified at trial about the long history of the Division's involvement with defendants, who were never married, and, at the time of trial, were married to other people. The caseworkers detailed much of the documentary evidence, which included past substantiated and unsubstantiated referrals for domestic violence and substance and alcohol abuse. Defendants' compliance with services was sporadic at best. The children had been twice removed from defendants and returned in attempted reunification prior to the 2014 removal that led to the guardianship trial.

In January 2013, Harry was convicted of an unrelated incident of aggravated assault and sentenced to a three-year term of imprisonment; the

Division supplied him with services during his incarceration and arranged for his monthly visitation with the children. Harry attended mental health and drug treatment after his release from prison in 2015, but his participation became sporadic. His case was closed in September 2015 after Harry threatened to blow up a Division office.

In early April 2014, the Division effected an emergency removal of the children after Carmela struck a pole in the middle of the night while driving under the influence; she had left the children home alone. Carmela's attendance at substance abuse counseling thereafter was inconsistent.

Initially, all three children were placed in the same resource home. Shortly thereafter, however, the Division placed Jack with a different family because the original resource home did not have a separate room for him and was licensed for only two children of school age. The Division's plan was to have the two girls adopted by the resource family, and for Jack to be adopted by them as well if the required changes could be made to the home. If not, the Division intended to seek a select home adoption for Jack, who had begun displaying significant behavioral problems.

Dr. Katz testified at trial and rendered opinions reached after he conducted evaluations of both defendants and bonding evaluations between each defendant

and the children.  Based on his testing, Dr. Katz concluded that Harry met diagnostic criteria consistent with bipolar disorder, "with numerous other dysfunctional character logical (sic) traits." Dr. Katz noted Harry's "extensive criminal history[,]" which included violent assaults against men and women, and that he had been incarcerated twice for assault.  Harry admitted to Dr. Katz that he had threatened Carmela and her mother, E.R., and had violated domestic violence restraining orders entered against him.  Dr. Katz testified that while the children recognized Harry as their father, "that perception was based more upon fantasy than reality."  So, too, was Harry's stated plan to become a "bounty hunter[,]" given the numerous arrests in his past.

Based on his testing, Dr. Katz found that Carmela had a "pervasive compulsive personality disorder with histrionic features[.]" She minimized her problems by denying any alcohol abuse and offered inconsistent versions of why the children were removed.  Carmela told Dr. Katz that Harry was physically and emotionally abusive towards her in front of the children, and the doctor described their relationship as co-dependent and violent.  With respect to Carmela's bonding evaluation, Dr. Katz testified that the children, particularly Debbie, exhibited a "conflict[ed]" attitude towards her mother, and Carmela displayed frustration at times in dealing with the children.  Dr. Katz concluded

that defendants were unable to parent the children, and that the children would be at risk of abuse and neglect if returned to defendants' care.

Dr. Katz also conducted a bonding evaluation between Debbie and Kathy and their resource parents. Dr. Katz conducted no bonding evaluation as to Jack, who was not in a potential adoptive placement at the time. Dr. Katz concluded that Debbie and Kathy had a "secure bond and stable attachment" to the resource parents and relied on the resource parents to meet their needs. According to Dr. Katz, the girls would suffer trauma if removed from the resource parents, and neither defendant was able to mitigate that trauma. Moreover, Dr. Katz believed there would be serious and enduring harm to all the children if they were returned to defendants. He testified that the resource parents were willing to have Jack live with them and were looking to expand their house to accommodate him. Dr. Katz recommended that if Jack's adoption by the resource parents were not possible, select home adoption was the best alternative.

The trial judge questioned Debbie, then thirteen years' old, in camera. Debbie wanted to live with Harry, claimed to have a good relationship with C.H. (Cindy), who married Harry in 2012, and Debbie did not want to be adopted. She acknowledged having a tumultuous relationship with Carmela.

Harry called Cindy as a witness at trial. At the time, she was living in North Carolina, tending to her ill mother, but said she intended at some point to move back to New Jersey. Cindy had five children of her own and said she had a strong relationship with Debbie, Jack and Kathy, even though she acknowledged having spent little more than one week with them together with Harry. Harry had offered Cindy as a possible placement for the children. However, one caseworker testified the Division could not process that request because of a 1998 referral involving Cindy and her ex-husband. Cindy testified that it involved her ex-husband's physical abuse of one of their children and was ruled unsubstantiated.

Harry also called Jack's resource parent, with whom Jack had been living for about four months, and Debbie's and Kathy's resource parent. Both defendants testified on their own behalf.

Additionally, Dr. Jason Fleming, a clinical psychologist, offered expert testimony on behalf of Carmela, who, the doctor observed, was "really trying" and was "very attentive" to the children. Dr. Fleming asserted that there was a "healthy, positive and secure attachment" between Carmela and the children, and that they would suffer harm if Carmela's parental rights were terminated. However, Dr. Fleming agreed with Dr. Katz that Carmela was presently unable

to successfully parent the children on her own, and he suggested that Carmela "co-parent" the children with her mother, E.R.

The trial judge filed a written opinion containing her findings and conclusions in support of the judgment of guardianship. We discuss them below and turn now to the evidence adduced at the remand hearing.

By March 2017, the Division had removed Debbie from her resource family home; Jack still had not been placed in a pre-adoptive home. Both children's behavioral and mental health had deteriorated, resulting in multiple placements, and, in Debbie's case, entry into an inpatient mental health facility and placement in a shelter. Upon receipt of our order, the remand judge initially ordered Dr. Katz to supplement his prior evaluations by considering this new information and to address whether it affected his prior opinions. The doctor's supplemental report acknowledged concerns about Debbie's and Jack's lack of permanent placement and the absence of any siblings in Kathy's resource home. However, as already noted, he could not make any recommendations without further information, which led to the judge's subsequently ordered evaluations.

Dr. Katz psychologically evaluated both defendants and Carmela's husband, B.B. (Bob). Dr. Katz testified before the remand judge that Carmela and her husband were living in E.R.'s basement, Carmela was unemployed, and

she had stopped taking her prescribed medications for treatment of depression, anxiety, post-traumatic stress disorder and bipolar disorder. Dr. Katz noticed the strong smell of alcohol on Carmela's breath during the interview, even though she denied having any. Dr. Katz reiterated his opinion offered at trial, i.e., that Carmela was unable to effectively parent the children.

As for Bob, Dr. Katz noted he, too, emanated the odor of alcohol, although Bob asserted he had been sober for many months. The doctor noted Bob's "extensive psychiatric history with long-term psychiatric hospitalizations," his low-level empathy toward children, and his lack of prior experience as a parent. Dr. Katz concluded that together, Carmela and Bob could not effectively parent the children, particularly Debbie and Jack who needed intensive monitoring and supervision. Dr. Katz continued to support termination of Carmela's parental rights.

Dr. Katz found no improvement in Harry's mental health or behaviors and expressed concern that Harry was not receiving treatment. Dr. Katz's initial opinions about Harry's lack of ability to parent had "become strengthened," and he opined that no one, including Cindy, had the capacity to curtail those behaviors and reduce Harry's risk to others. Dr. Katz testified that Debbie and Jack had exhibited deteriorating behavior, and he opined that Harry would be

unable to deal with the children. The doctor conceded that interviewing the children would have provided him with the best data, but he did not do so.

The remand judge also considered the expert testimony of Dr. Donald Franklin, a psychologist who evaluated Cindy and Harry and testified on Harry's behalf. Dr. Franklin confirmed that Harry was suffering from bipolar disorder and that he needed to be in treatment indefinitely. However, Dr. Franklin opined that Harry and Cindy were in a positive relationship, which they had maintained for several years. Dr. Franklin could not give an opinion as to whether Harry would be able to parent the children with Cindy because he had not done an assessment of the children to determine the severity of their problems. Thus, Dr. Franklin said that the "jury [wa]s out" as to whether Harry can care for the children.

Dr. Fleming testified again on behalf of Carmela regarding his psychological evaluation of her and Bob.[3] He concluded that Carmela was significantly more stable but needed to better address her depression, anxiety and low self-esteem. Dr. Fleming believed that together with her husband and mother, Carmela could co-parent the children effectively.

---

[3] Dr. Fleming included Carmela's mother, E.R., in his evaluation. The Division's supplemental brief asserts E.R. has since passed away.

A-4736-15T2

Kathy's Law Guardian produced Dr. Elizabeth Smith as an expert witness in psychology.[4] Dr. Smith evaluated Kathy and concluded she was "thriving with limited contact with her siblings[ and] . . . with no contact with her biological parents, for two years." Kathy told Dr. Smith that living with her resource parents and her pets made her happy; what made her scared was going back to her biological parents or being again placed in foster care. Dr. Smith also interviewed Kathy's resource mother, who the doctor opined was appropriately fulfilling Kathy's needs.

In a comprehensive oral opinion, the remand judge reviewed the hearing evidence and the evidence supporting termination as found by the trial judge. The judge concluded that the change in Debbie's and Jack's circumstances would have altered the analysis regarding the prong four proof at trial. Neither child now had a reasonable prospect for long-term placement or adoption. The judge vacated the judgment terminating defendants' parental rights to Debbie and Jack, ordered therapeutic visitation between defendants and the two children, and returned the litigation to the FN docket.

---

[4] Early in the remand proceedings, the judge appointed a separate Law Guardian to represent Kathy, while the original Law Guardian continued to represent Debbie and Jack.

However, as to Kathy, the judge concluded the child was "thriving," hoped to be adopted, and was fearful of reuniting with defendants. The judge explained:

> [S]he stands in a totally different position than both [Debbie] and [Jack]. And that standard of [Rule] 4:50 that the change in circumstances would alter [the trial judge's] decision hasn't been met. . . . [T]herefore, I believe the motion regarding [Kathy] should not be granted and that the judgment regarding . . . the parent's termination to [Kathy] should stand.

The judge entered an order denying the motion to vacate the judgment of guardianship as to Kathy.

## II.

We first consider whether the trial evidence supported the entry of the judgment of guardianship. To terminate parental rights, the Division must prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347–48 (1999).]

"The focus of a termination-of-parental-rights hearing is the best interests of the child." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 110 (2011)). The four statutory prongs "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280 (2007) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

Our standard of review is limited. We must uphold the trial court's findings if "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). We defer to the judge's factual findings because she had "the opportunity to make first-hand

16

credibility judgments about the witnesses . . . [and] ha[d] a 'feel of the case' that can never be realized by a review of the cold record." E.P., 196 N.J. at 104 (quoting M.M., 189 N.J. at 293). We accord even greater deference to the Family Part's factual findings because of its "special jurisdiction and expertise in family matters[.]" N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)).

### A.

After the close of trial, the judge issued a written statement of reasons for admitting into evidence several documents offered by the Division over defendants' objection. These were psychological evaluations of defendants performed at the Division's behest years prior to the 2014 removal of the children. The judge found the exhibits were admissible because Dr. Katz relied upon them in completing his reports "pursuant to [N.J.R.E.] 803(c)(6)[.]" At trial, Dr. Katz did not cite the exhibits during his testimony as documents he relied on in rendering his opinions.

As we understand his argument, Harry claims that the judge erred in admitting the documents because she mistakenly found that Dr. Katz had relied on them when he had not. And, even had Dr. Katz relied on them, the exhibits were inadmissible hearsay. Harry contends this undermines the judge's reliance on Dr. Katz's opinions in finding the Division carried its burden of proof.

"We grant substantial deference to the trial judge's discretion on evidentiary rulings[] and will only reverse when the trial judge's ruling was 'so wide of the mark that a manifest denial of justice resulted.'" N.J. Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 172 (App. Div. 2012) (quoting State v. Carter, 91 N.J. 86, 106 (1982)) (citations omitted). "However, no deference is accorded when the court fails to properly analyze the admissibility of the proffered evidence." E&H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 25 (App. Div. 2018) (citing Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012)).

Initially, Harry's claim that the judge mistakenly believed Dr. Katz relied on the exhibits is not entirely accurate. The doctor mentioned two of the exhibits in his reports, which were also admitted into evidence at trial without objection.

"[U]nder N.J.R.E. 703, an expert may give the reasons for his opinion and the sources on which he relies, but that testimony [cannot] establish the

18

substance of the report of a non-testifying [expert]." Agha v. Feiner, 198 N.J. 50, 64 (2009) (citing Day v. Lorenc, 296 N.J. Super 262, 267 (App. Div. 1996)). The "expert testimony [at trial cannot] serve as 'a vehicle for the wholesale [introduction] of otherwise inadmissible evidence.'" Id. at 63 (second alteration in original) (quoting State v. Vandeweaghe, 351 N.J. Super. 467, 480–81 (App. Div. 2002)). Therefore, pursuant to N.J.R.E. 703, it was error to admit the exhibits into evidence because of any actual or perceived reliance by Dr. Katz.

However, "Rule 5:12-4(d) permits the Division to introduce 'reports by staff personnel or professional consultants' into evidence provided the documents satisfy the requirements of the business records exception, N.J.R.E. 803(c)(6) and 801(d)." M.G., 427 N.J. Super. at 173 (citing N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 129 (App. Div. 2010)). "[E]xpert conclusions or diagnoses within such reports are subject to a further admissibility determination under N.J.R.E. 808." N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 158 (App. Div. 2018) (citing M.G., 427 N.J. Super. at 173). Although the exhibits were admissible as business records, the judge failed to redact those portions that contained complex psychological diagnosis and opinions. See, A.D., 455 N.J. Super. at 158.

Nevertheless, nothing in the judge's written decision supporting the judgment of guardianship demonstrates she relied on the disputed exhibits, or that her findings and conclusions regarding Dr. Katz's testimony had anything to do with whether the expert relied upon the disputed evidence. As such, any error in failing to redact included hearsay within the exhibits was harmless. R. 2:10-2.

## B.

Turning to defendants' substantive arguments as to the first prong of the statutory test, Carmela contends the Division failed to prove that she had harmed the children or subjected them to a substantial risk of harm. Harry argues that the Division relied on evidence beyond the allegations pled in its complaint, the judge failed to distinguish between the actions of each parent, and the judge erroneously found the risk of future harm without support in the record.

Pursuant to the first prong of the statute, the Division must establish "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The focus is not on a

single or isolated harm, but on "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)).

The trial judge found that Carmela's continued failure to abstain from drug and alcohol use endangered the children. The judge credited Dr. Katz's opinions, particularly regarding Carmela's mental stability and ability to parent in the future. The judge accepted Dr. Katz's conclusions about Harry's violent past and the likelihood of future aggressive or violent conduct that would put the children at risk.

Carmela contends that evidence of her intractable substance abuse was insufficient proof under prong one; however, the judge did not rely solely upon that finding. The judge cited the reason for the children's removal, i.e., Carmela's DWI that occurred late at night after she left the children alone, Carmela's mental health, and the opinions of both Dr. Katz and Dr. Fleming that she was unable to parent the children on her own in the foreseeable future.

Harry incorrectly argues that the judge relied on his incarceration as proof of harm; she did not. We reject out of hand Harry's claim that the judge

conflated Carmela's conduct with his and failed to separately assess the Division's proofs as to whether he harmed the children or posed the risk of future harm. The judge's opinion repeatedly discusses Harry's conduct and diagnoses, both in the context of the family unit and otherwise. To the extent we have not addressed defendants' other arguments regarding the prong one evidence, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

## C.

Under N.J.S.A. 30:4C-15.1(a)(2), "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). "Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents[.]'" Ibid. (first alteration in original) (quoting K.H.O., 161 N.J. at 363); see also N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004) ("[T]he . . . statute[] reflect[s] reforms acknowledging the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child.").

As to the second prong, the trial judge concluded that despite having received services from the Division for years, both defendants were "unwilling

22

or unable to correct the harm that led to the children's removal." The judge credited the testimony of Dr. Katz, "that both parents were unable to parent the children now or in the foreseeable future due to a pattern of behavior that began with the first contact the Division made with the parents in 2003." She noted Dr. Fleming's "same determinations" regarding Carmela. The judge also found that neither parent had the financial ability to provide a stable and safe home for the children. "Based upon the totality of the credible evidence and Dr. Katz'[s] expert opinion," the judge concluded "the Division ha[d] proven by clear and convincing evidence that the defendants are unable or unwilling to eliminate the harm to the children and delaying the permanent placement will add to the harm."

Carmela argues that by the time of trial, she was working, had her own home apart from Harry, and was compliant with the Division's services. Harry contends the judge once again conflated the evidence against Carmela in considering the Division's proofs against him on prong two, and that there was no substantial credible evidence that he was unwilling or unable to prevent any future harm to the children. We again disagree.

Carmela's history of past drug and alcohol abuse was undisputed, and her inability to address the issues is beyond cavil. Even Dr. Fleming concluded that

any progress she had made needed to be tempered with a recognition of her serious mental health issues and the likelihood that she could not parent the children without the help of others.

Harry points to positive developments in his employment and housing at the time of trial. However, they were speculative at best. The judge fairly considered the evidence against Harry, including his intractable violent behavior toward Carmela and others, as well as his unwillingness to abide by prior restraining orders entered against him. In short, the prong two evidence was clear and convincing.

D.

N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights[.]" However, "[e]xperience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. Moreover, "[e]ven if the Division ha[s] been deficient in the services offered to" a parent, reversal is not necessarily "warranted, because the best interests of the child controls[]" the ultimate

determination.  N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007).

Although N.J.S.A. 30:4C-12.1(a) requires the Division to search for and assess potential relatives as placement resources, it "may decide to pursue the termination of parental rights if [it] determines that termination of parental rights is in the child's best interests."  N.J.S.A. 30:4C-12.1(c); see also N.J. Div. of Child Prot. & Permanency v. C.S., 432 N.J. Super. 224, 229 (App. Div. 2013) (noting that under subsection (c), the child's best interests is always the "polestar").

In her written opinion, the trial judge discussed the services provided to defendants over the Division's long history with the family.  The judge acknowledged that the Division "could have done more to ascertain [Cindy's] qualifications to be a resource parent," but found that she and Harry had no "marital relationship[,]" since Cindy was living in North Carolina and had no "real relationship with the children."  The judge also noted that other people Harry referred to the Division as possible resource placements never filed an application.

Both defendants argue the Division failed to consider alternatives to termination of their parental rights, and Harry additionally contends the Division

failed to provide adequate services focused on reunification. We reject the arguments.

Without any authority, Harry seemingly contends that consideration of services the Division provided prior to the 2014 removal was irrelevant because they were not provided for the purposes of reunification after 2014. He cites no authority for this proposition, but, more importantly, the argument fails to recognize the importance of the two prior removals and failed attempts at reunification, which amply supported the judge's finding as to the adequacy of the Division's services. We also reject Harry's claim that the Division abdicated its obligations because he was incarcerated. The record does not support the contention.

Defendants' argument that the Division failed to consider other relatives for placement is also unpersuasive. The judge noted that the Division could have done more to clarify whether the referral in Cindy's past was against her husband, as she claimed, and the circumstances that resulted in the Division's alleged involvement at that time. Harry argues the judge's failure to require the Division to produce any and all of its records from the 1998 referral, despite his counsel's repeated requests, equates to a failure of proof as to prong three. However, the judge explained the reasons why Cindy was not a realistic

placement alternative. She was living in North Carolina, had no established date for her return to New Jersey, and had never lived for more than a total of ten days with Harry and the children together.

We also reject Carmela's claims that the Division failed to consider adequately her mother as a placement resource. The testimony at trial indicated that E.R. did not offer herself as a placement resource. To the extent we have not specifically addressed defendants' other contentions, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

### E.

Prong four requires the Division to prove "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108.

As the Court has explained, "[t]o determine whether the comparative harm is proscribed by the fourth prong in a case involving a child in foster care, . . . the court must inquire into the child's relationship both with [its] biological

parents and [its] foster parents." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 181 (2010) (alterations in original) (quoting K.H.O., 161 N.J. at 355). Typically, "the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281).

However, "courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." E.P., 196 N.J. at 109 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610–11 (1986)). "Such harm may occur when a child is cycled through multiple foster homes after a parent's rights are severed." Ibid.

The trial judge credited Dr. Katz's testimony that the children had no appreciable parental attachment to defendants. To the contrary, Debbie and Kathy had a strong bond with their resource parents.[5] The girls' resource mother testified at trial that she wished to have all three children ultimately reside with her and her husband, and that Jack was spending time visiting his sisters and had a seemingly good relationship with them and the resource family. The judge

_____

[5]  We note in passing that although Debbie told the trial judge during the in camera interview she did not wish to be adopted, a child's wishes "should be but one factor" in the judge's decision making calculus. E.P., 196 N.J. at 113.

noted that Dr. Fleming agreed that Carmela was unable to parent the children by herself in the foreseeable future.

In their original briefs, defendants essentially challenged the weight that the judge gave to Dr. Katz's opinions regarding the bonding evaluations. At the time, the Law Guardian echoed those arguments. However, now we consider only whether the trial evidence supported the judge's conclusion that the Division had met it burden of proof regarding prong four as to Kathy. We conclude the evidence was sufficient to support the judgment of guardianship as to Kathy.

III.

The issue now becomes whether the remand judge mistakenly exercised her discretion by failing to vacate the judgment of guardianship. See J.N.H., 172 N.J. at 473 ("It is within the trial court's sound discretion, guided by equitable principles, to decide whether relief should be granted pursuant to Rule 4:50-1." (citing Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994))). We will not reverse the judge's decision "unless it represents a clear abuse of discretion." Ibid. (quoting Hous. Auth., 135 N.J. at 283).

A motion brought pursuant to the Rule must be 1) supported by changed circumstances; and, 2) the moving party bears the burden of proving that

subsequent events justify relief.  Ibid.; see also N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 225–26 (2010) (applying same standards to motion to vacate judgment of Kinship Legal Guardianship); N.J. Div. of Youth & Family Servs. v. T.G., 414 N.J. Super. 423, 434–36 (App. Div. 2010) (applying same standards to motion to vacate voluntary surrender of parental rights).

Rule 4:50-1(e) provides relief from "prospective application" of a judgment that is "no longer equitable."  "The moving party 'bears the burden of proving that events have occurred subsequent to the entry of a judgment that, absent the relief requested, will result in "extreme" and "unexpected" hardship.'" J.N.H., 172 N.J. at 473 (quoting Hous. Auth., 135 N.J. at 285–86).  Subsection (f) of the Rule provides relief for "any other reason[.]"  "Similar to subsection (e), because of the importance in the finality of judgments, relief under subsection (f) is available only when 'truly exceptional circumstances are present.'"  Ibid. (quoting Hous. Auth., 135 N.J. at 286).

"Regardless of the basis, vacation of a judgment under Rule 4:50-1 should be granted sparingly."  Id. at 473–74 (citing Pressler, Current N.J. Court Rules, comment 1.1 on R. 4:50-1 (2001)).  Furthermore, "in a parental termination case, the primary issue is not whether the movant was vigilant in attempting to vindicate his or her rights or even whether the claim is meritorious, but what

effect the grant of the motion would have on the child." Id. at 475. Applying these standards to the facts of this case, it is clear that the remand judge did not mistakenly exercise her discretion by denying defendants' motion to vacate the judgment of guardianship as to Kathy.

Both defendants' supplemental briefs reargue the points raised after trial, specifically, that the evidence supporting the judgment of guardianship was insufficient. Carmela does so in the context of the remand judge's purported misapplication of the holding in J.N.H.

The remand judge seemingly focused on the correctness of the original judgment, and whether evidence of changed circumstances regarding the children undermined the trial judge's legal conclusions supporting termination. As the Court made clear in J.N.H.,

> The very purpose of a Rule 4:50 motion is not, as in appellate review, to advance a collateral attack on the correctness of an earlier judgment. Rather, it is to explain why it would no longer be just to enforce that judgment. The issue is not the rightness or wrongness of the original determination at the time it was made but what has since transpired or been learned to render its enforcement inequitable.
>
> [172 N.J. at 476.]

" [O]ur examination of whether defendant's motion was properly denied is guided by the two-pronged examination articulated in J.N.H." T.G., 414 N.J.

Super. at 435. The judge found circumstances had changed since the judgment was entered as to Debbie and Jack because neither child now had reasonable prospects for adoption. Focusing on prong four, the judge granted the motion as to those two children.

However, she reviewed the remand evidence regarding Kathy and concluded that defendants failed to demonstrate sufficient changed circumstances in the first instance. In other words, the judge found that neither developments in defendants' lives since the judgment was entered, nor "the minimal change in circumstances of [Kathy's] position," were sufficient to vacate the judgment. We defer to the remand judge's factual findings, which were amply supported by the credible evidence in the record. See, e.g., R.G., 217 N.J. at 552. We agree that there was little evidence of change in defendants' lives that justified the extraordinary relief of vacating the judgment of guardianship, and, as the judge noted, the only change in Kathy's circumstances was the absence of Debbie from her resource home and the likelihood that Kathy would reside in a home without either sibling.

Nevertheless, even if the judge mistakenly concluded the change in Kathy's circumstances was insignificant, we affirm for reasons in addition to those expressed in the judge's oral opinion. See, e.g., Hayes v. Delamotte, 231

N.J. 373, 387 (2018) ("A trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning." (citing Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968))).

Simply put, neither defendant demonstrated that the judgment of guardianship as to Kathy was now inequitable or unjust, i.e., that exceptional circumstances made prospective application of the judgment was no longer in Kathy's best interest and presented an extreme and unexpected hardship to the child. J.N.H., 172 N.J. at 473–74. The record is replete with the remand judge's factual findings to the contrary.

We reject the procedural arguments Harry raises in his supplemental brief. Our remand order only required the judge to consider defendants' motions to vacate the guardianship judgment if they were made. It set no parameters on the exercise of the judge's discretion as to the conduct of the proceedings after defendants' motions were made. Harry contends the judge's refusal to permit new bonding evaluations denied him due process and a full development of what had transpired since entry of the judgment. We disagree.

In our view, the judge accorded both defendants the opportunity to present evidence of changed circumstances in their lives and in Kathy's life. The judge permitted a psychological evaluation of Kathy by Dr. Smith. Defendants then

had the opportunity to cross-examine Drs. Katz and Smith. Both defendants produced their own expert testimony. As the remand judge explained in denying requests for new bonding evaluations, Kathy had not seen her parents for a substantial period of time. We cannot conclude the judge mistakenly exercised her discretion by limiting the expert testimony at the hearing.

We already addressed Harry's claim that the Division's "misconduct" in failing to evaluate Cindy as a placement resource requires reversal of the judgment, and we need not discuss the issue again in the context of Harry's supplemental briefing. To the extent we have not otherwise addressed Harry's arguments, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION